[No. 20799.    Department One.    December 2, 1927.]

ANNIE CARPENTER, *Appellant,* v. PACIFIC MUTUAL LIFE INSURANCE COMPANY, *Respondent.*[1]

[1] INSURANCE (128) — ACCIDENT INSURANCE — EXTERNAL AND ACCIDENTAL MEANS OF INJURY—BLOOD POISONING.  An accident policy covering loss of life "resulting independently of all other causes from bodily injuries effected through external, violent and accidental means," covers the loss of a farmer's life from blood poisoning from infection in skinning a sheep while his hands were somewhat abraded, where the expert testimony was to the effect that abrasions would result in infection from such exposures, perhaps not once in hundreds of times.

[2] SAME (128).  In such a case, the infection was "accidental," and through "external and violent" means, within the provisions of the policy, irrespective of any existing abrasions on the hands, where it appears that it might result only on some rare occasion, with no known difference in conditions, and was not intended or expected.

Appeal from a judgment of the superior court for Yakima county, Hawkins, J., entered February 5, 1927, upon findings in favor of the defendant in an action upon an accident insurance policy, tried to the court. Reversed.

*C. P. Borberg,* for appellant.

*Rigg & Venables* and *Nat U. Brown,* for respondent.

[1]Reported in 261 Pac. 792.

Tolman, J.—Appellant is the beneficiary under an accident policy issued by respondent to one George W. Carpenter, a farmer by occupation. The policy insures against loss of life, limbs or sight

". . . resulting independently of all other causes, from bodily injuries effected through external, violent and accidental means."

The insured died from blood poisoning during the life of the policy; notice and proof of death, as required by the policy, were given, liability was denied, and this action followed. After a trial on the merits to the court, a judgment was entered denying recovery, and the plaintiff has appealed from that judgment.

The facts are but little in dispute and may be briefly stated as follows: The insured discovered, while about his daily tasks on the farm, that one of his sheep had died, and proceeded to skin it. At the time, his hands were somewhat abraded, as is not unusual with men engaged in rough work. After he had completed the skinning, he washed his hands and applied carbolic salve as a disinfectant, as was his usual custom. The following day he complained of pain in his arm, and upon its increasing, he consulted a physician the next day. Later that day he took to his bed, was removed to the hospital on the following day, and, although he was given what appears to have been proper and skillful treatment, he died within five days from the time of the skinning of the carcass of the sheep. The physician and surgeon who attended the assured, testified:

"Q. Did you examine his hands, and in particular the right hand? A. Yes, both hands. Q. State the condition of that hand. A. A number of small abrasions about the knuckles of the right hand, and also the left, where the epidermis had been removed or abraded from the knuckles—three of these knuckles of the right hand, and one or two about the distal knuckles of the right hand; small abrasions like a farmer will have

when they have been handling rough timbers and such things;"

and gave it as his opinion that the condition of the hands and the act of skinning the sheep were the sole and only causes of the infection which caused the death of the insured. The doctor did not know, or pretend to say, what caused the abrasions on the hands. There is evidence from others that these abrasions existed to some extent before the skinning of the sheep. As to the possibility or likelihood of infection under the circumstances, the doctor further testified:

"Q. So that the percentage in favor of an infection where there is an abrasion is very great? A. Well, I wouldn't say it is very great. If I might explain. Q. Yes. A. For the reason that we are coming in contact with these germs *are* all the time. They are everywhere. You can find them on most any part of the body. It is only when the favorable circumstances comes about that infection takes place. You may abrade your finger several times or hundreds of times and nothing happen; some day you may do it and have virulent infection and maybe lose your life. Q. You never know when those conditions exist. Isn't it a fact it is the universal practice of the medical profession, and even laymen, to disinfect any kind of a wound? A. That is right. . . . Q. We mean about the same thing; it would be an ordinary and natural sequence from those circumstances, wouldn't it? A. I think not. May I explain? Q. Yes. A. Because we see so many of these things, so many people with abrasions go all their life and never have infection, perhaps—careless, filthy, and all that. I wouldn't say it would be ordinary sequence. Q. It is a natural sequence? A. It is a natural sequence."

And again:

"Q. Why did you say it might come from a number of other things? Is it an ordinary thing, certain to proceed wherever there is an abrasion? A. We know these germs are present on door knobs, dishes, and clothes; if there is an abrasion and all circumstances

are favorable, it may occur from anything. It may occur from the water in which you wash your hands, or in combing your hair. Q. It is an ordinary natural sequence which follows an abrasion of the skin? A. Not an ordinary; it is natural. Q. Why would you say it may follow from any of these, but still you say it is not ordinary? Do you mean on the percentage of all people living that have abrasions that don't become acquainted with it? A. There is only a small percentage of the abrasions, no matter what we do, that result in infection.''

[1] The trial court rendered his opinion in writing, and we thus have the advantage, which is usually denied us, of knowing just what influenced his mind and caused him to reach his conclusions. His thought seems to have been that, while this was an accidental death, it was not a death caused by accidental means. He says: ·

''. . . there was nothing accidental connected with the skinning of the sheep, that is, he intended to skin the sheep, just as he did, and the evidence excludes the supposition of an accident in connection therewith, such as the slipping of the knife and the accidental cutting of the hand, or other accident in connection therewith.''

Here, we think, lies the crux of the whole question. It is true that the complaint did not allege that the abrasions upon the hands of the deceased were accidentally inflicted at or before the time he engaged in skinning the sheep, but evidence was introduced, without objection, to the effect that the abrasions existed to some extent before the act of skinning was undertaken; but as to how they were caused, there was no word of information. The complaint must be considered amended to conform to the evidence thus received; and our first inquiry must be as to what inference is to be drawn therefrom. It is never presumed that one wilfully and purposely injures himself, or that another

has wantonly or wilfully injured him. It would seem that, these marks of violent injury being shown to exist, a proper inference to draw would be that they were caused by ''external, violent and accidental means,'' as provided in the policy.

So clearly does this appear to be a reasonable and logical inference that we would be content to accept it without authority, but authority is not lacking.

''No direct evidence was introduced to show any of the circumstances which caused the wound or abrasion. It was apparently very slight, and would of itself have attracted little attention. Only its existence is shown by direct evidence. How and when it was inflicted does not appear. The burden was at all times upon the plaintiff to show, not only the death of the assured, but that it was caused by violent, accidental and external means. *Taylor v. Pacific Mutual Life,* 110 Iowa 621. The appearance of the wound would clearly support the finding that the cause of the wound was violent and external. *Jenkins v. Hawkeye Commercial Association,* 147 Iowa 113.

''The remaining question is: Did the assured receive his wound through accidental means? It has been repeatedly held that, in the absence of direct evidence on the subject, a presumption arises that the wound was not intentionally inflicted either by the assured or by another. This presumption is almost the equivalent of a presumption that the wound was inflicted through accidental means. The authorities, however, stop short of announcing the presumption in this latter form. They do hold, however, that the presumption first stated is available to the plaintiff as affirmative evidence; and that an inference may be drawn therefrom by the triers of fact that the wound was caused by accidental means as the only other alternative. *Jones v. Insurance Co.,* 92 Iowa 654; *Connell v. Iowa State Insurance Co.,* 139 Iowa 444; *Travelers' Insurance Co. v. McConkey,* 127 U. S. 661 (8 Sup. Ct. 1360, 32 L. Ed. 308); *Cronkhite v. Travelers' Insurance Co.,* 75 Wis. 116 (43 N. W. 731, 17 Am. St. Rep. 184); *Freeman v. Insurance Co.,* 144 Mass. 572 (12 N. E. 372); *Aetna*

*Life Insurance Co. v. Milward,* 118 Ky. 716 (82 S. W. 364, 68 L. R. A. 285, 4 Ann. Cas. 1092) ; *Preferred Accident Co. v. Fielding,* 35 Colo. 19, . . ." *Caldwell v. Iowa State Traveling Men's Association,* 156 Iowa 327, 136 N. W. 678.

[2] Nor are we satisfied that, laying aside the previous abrasions, the infection itself was not an accident within the meaning of the policy. From the evidence we have already quoted, it will be seen that one might do just as the deceased did innumerable times with no ill results; but, on some rare occasion, with no known difference in conditions, infection would result. The germ enters from the outside; therefore, it is external. It is a foreign substance forced into the circulatory system; therefore, it enters by violence. Its entry was not intended or expected; therefore, it was accidental.

The following authorities tend strongly to support this view.

"It is further urged that there was no evidence to support the verdict because no accident was shown. We do not concur in this view. The two companions of the deceased jumped from the same platform, at the same time and place, and alighted safely. It must be presumed not only that the deceased intended to alight safely, but thought that he would. The jury were, on all the evidence, at liberty to say that it was an accident that he did not. The court properly instructed them that the jumping off the platform was the means by which the injury, if any was sustained, was caused; that the question was, whether there was anything accidental, unforeseen, involuntary, unex- pected, in the act of jumping, from the time the deceased left the platform until he alighted on the ground; that the term 'accidental' was used in the policy in its ordinary, popular sense, as meaning 'happening by chance; unexpectedly taking place; not according to the usual course of things; or not as expected;' that, if a result is such as follows from ordinary means, voluntarily employed, in a not unusual or unexpected way, it cannot be called a result effected by

accidental means; but that if, in the act which precedes the injury, something unforeseen, unexpected, unusual occurs which produces the injury, then the injury has resulted through accidental means." *United States Mutual Accident Association v. Barry,* 131 U. S. 100, 38 L. Ed. 60.

See, also, *James v. State Life Ins. Co.,* 83 Ind. App. 344, 147 N. E. 533; *Bryant v. Continental Casualty Co.,* 107 Texas 582, 182 S. W. 673, Ann. Cas. 1918A 517; *Lewis v. Ocean Accident & Guarantee Corp. of London,* 224 N. Y. 18, 120 N. E. 56; *Christ v. Pacific Mutual Life Ins. Co.,* 312 Ill. 525, 144 N. E. 161; *Brown v. Continental Casualty Co.,* 161 La. 229, 108 South. 464; *Carter v. Standard Accident Ins. Co.,* 65 Utah 465, 238 Pac. 259; *Hornby v. State Life Ins. Co.,* 106 Neb. 575, 184 N. W. 84; *Rowe v. United Commercial Travelers' Association,* 186 Iowa 454, 172 N. W. 454; *Interstate Business Men's Accident Ass'n v. Lewis,* 257 Fed. 241.

Several of these cases have a surprising similarity as to the facts, and, when carefully read, each and all support a holding that the infection was of itself an accident within the terms of the policy.

There are many authorities holding to a contrary and narrower rule, some upon facts but little differing from those shown here. They cannot be reconciled with the cases we have cited, whose views we have adopted, and therefore it would be useless to cite and discuss them.

We conclude that the appellant is entitled to a judgment for the amount of the death loss fixed by the policy, with interest at the legal rate from the date of the denial of liability.

Reversed and remanded, with instructions to enter judgment accordingly.

MACKINTOSH, C. J., PARKER, FRENCH, and MITCHELL, JJ., concur.