[Nos. 20846, 20845, 20844, 20843.  Department One.  April 3, 1928.]

SEATTLE CAN COMPANY, *Respondent*, v. DEPARTMENT OF
LABOR AND INDUSTRIES *et al.*, *Appellants*
(three cases).

LAUNCELOT G. NOEL, *Respondent*, v. DEPARTMENT OF
LABOR AND INDUSTRIES *et al.*, *Appellants*.[1]

[1] MASTER AND SERVANT (20-1)—WORKMEN'S COMPENSATION—FOR-
TUITOUS EVENT—BENZOL POISONING. Workmen in a can factory
who become poisoned by benzol acid fumes by reason of work-
ing in a room without proper ventilation to dissipate the poison
fumes come within the meaning of injury by a fortuitous event
as provided in Rem. Comp. Stat., § 7675, and are entitled to
compensation under the workmen's compensation act.

Appeals from judgments of the superior court for
King county, Ralston, J., entered May 27, 1927, in favor
of plaintiffs, reversing upon an appeal orders of the
department of labor and industries disallowing claims
for compensation.  Affirmed.

*The Attorney General* and *Mark H. Wight, Assist-
ant*, for appellants.

*Huffer, Hayden, Merritt, Summers & Bucey*, for
respondent Seattle Can Company.

*S. H. Kelleran*, for respondent Noel.

TOLMAN, J.—These cases all come here on the same
record and by stipulation of counsel are practically
consolidated for the purposes of this appeal.

Three women, employed by the Seattle Can Com-
pany during the spring and early summer of 1924, be-
came affected with what is known as benzol poisoning.
Two apparently have recovered, or will recover, and
one died.  Claims were presented to the department of
labor and industries, and rejected on the ground that

¹Reported in 265 Pac. 739.

the conditions complained of were not due to any fortuitous event, but were in the nature of an occupational disease. The Seattle Can Company, the employer, appealed from the order of the department rejecting these claims to the superior court for King county, and the personal representative of the deceased employee also appealed in that case, making four cases in the superior court, but involving only the three so-called accidents. After a trial on the merits, the superior court reversed the action of the department in all of the cases and remanded them for classification and award as the law directs. The department has appealed and presents here the single, but by no means simple, question, Was there a fortuitous event within the meaning of the workmen's compensation act? The act itself, Rem. Comp. Stat., § 7675 [P. C. § 3470], provides:

[1] "The words 'injury' or 'injured' as used in this act refer only to an injury resulting from some fortuitous event as distinguished from the contraction of disease."

So, if the workers here involved contracted an occupational disease, as distinguished from an injury caused by a fortuitous event, they are entitled to no relief under the act, but must seek it elsewhere.

The facts essential to our present inquiry, as found by the trial court, are:

"That appellant, Seattle Can Company, is a corporation organized and existing under and by virtue of the laws of the state of Washington, with its principal place of business in Seattle, King county, Washington, and has paid its last license fee due the state of Washington. That at all the times above mentioned, while the said Mrs. A. Bridge was working for, and for many years prior thereto, the Seattle Can Company was and has been operating a can manufacturing factory in King county, Washington, and during all

said time in compliance with the laws of the state of Washington, relating to employers engaged in an extra-hazardous industry or occupation, has paid into the treasury of the state of Washington a sum equal to the per cent of its pay rolls as required by law, and in pursuance to its classification thereunder.

"That in the process of making cans in the room in said factory where said Mrs. A. Bridge was working, a process or system was regularly employed by said can company whereby a compound was used which contained benzol and rubber in solution, which, by mechanical process was deposited as a liquid around the edge of the tops of cans manufactured by said plant to form a rubber sealing compound when the benzol was evaporated from said rubber in solution through mechanical contrivances used in said room. That said contrivances for abstracting the benzol from said compound consisted of a dryer heated by gas with natural ventilation caused by the rising of the hot air passing through said dryer with the benzol mixed therewith through pipes into the open air which was intended to, and could have been made to carry off all of the evaporated benzol, but which failed to do so. That for many years prior to the employment of said Mrs. A. Bridge in 1924, the same kind of benzol compound had been used with the same contrivance for drying and ventilating, and with the room in which such drying and ventilating machinery was situated, containing two open doorways out into the air and having on one side thereof an opening for the air to circulate through said room from the other part of the factory, and that by reason of such conditions of ventilation, all of the benzol which escaped in said room was carried off and there had not been any case of benzol poisoning at said factory previous to the summer of 1924. That in the fall of 1923 and spring of 1924 an addition was placed on said building at said room whereby the opening into the open air through said doorways was obstructed and the opening into the factory was closed, the rest of the machinery drying and ventilating apparatus in said room remaining the same. That the Seattle Can Company in making

such alterations did so without knowledge that the result thereof would be to lessen the ventilation in said room, that benzol would accumulate therein, and that its employee said Mrs. A. Bridge, might become poisoned by an excessive quantity of such poisonous substance referred to as benzol escaping into and accumulating in said room. That by reason of the fact that benzol did escape into said room and was not removed by proper ventilation, Mrs. A. Bridge was poisoned. That a like rubber compound, applied as aforesaid, had been used for many years in the plant of the Seattle Can Company, as the plant existed prior to said additions having been placed thereon as aforesaid, without any injurious effect to its workers prior to the season of 1924, and that the associated plants of the Seattle Can Company at Los Angeles and other Pacific points had also used a like benzol compound and drying machinery in a similar manner to that used by the Seattle Can Company, before the addition to said building, and that at none of said plants had there been any benzol poisoning during their many years of operation; that benzol is a volatile substance and an increase in heat causes the same to evaporate in greater quantities. That said Mrs. A. Bridge first showed symptoms of poison coincident with hot weather in the city of Seattle, and became finally incapacitated substantially simultaneously with hot weather. That the poisonous substance of benzol acts by absorption through the lungs and upon the blood corpuscles, first injuriously affecting the white blood corpuscles and ultimately destroys the same, and the red corpuscles. That any gradual poisoning by benzol could have been readily detected by proper medical examination before the human system would have absorbed a sufficient quantity thereof to become dangerous; that the danger of poisoning from benzol could have been entirely eliminated at said plant by proper ventilation, and benzol poisoning in the ordinary operation of the Seattle Can Company factory is not an industrial disease. That the benzol poison escaped and accumulated in said room where said Mrs. A. Bridge was employed in dangerous quantities without the knowledge, design

or deliberate intention of the Seattle Can Company or of said Mrs. A. Bridge, and was a fortuitous event in connection with her employment as distinguished from a disease."

The department does not seriously question these findings, but seems to complain because their effect was not limited by making the finding proposed by the department as follows:

"That Mrs. A. Bridge was one of those persons employed in said 'press room' from about February 1, 1924, and that she worked continuously in said room to about May 12th, when the poisonous air containing benzol fumes or vapor had so gradually, slowly and insidiously reduced her blood corpuscles as to create objective and subjective symptoms of the effect of breathing the poisonous air as aforesaid, but that she continued to work until about June 12th, when the effect of breathing the impure air over said long period had so reduced the corpuscles in her blood as to make it necessary for her to discontinue her work."

Some part of this proposed finding we are disposed to accept as established by the evidence, particularly the part outlining the length of the employment and of the exposure to the poisonous fumes; and, to some extent, the part indicating that those fumes had not been innocuous prior to the hot weather, when their effect became apparent. But as so modified, do the facts indicate a fortuitous event or an occupational disease?

The department seems to rely almost wholly on the late case of *Depre v. Pacific Coast Forge Co.*, 145 Wash. 263, 259 Pac. 720, where our previous decisions are cited and analyzed; and there is language there which, when torn from the context, can be used to somewhat support the appellants' position here. That language, however, must be construed in the light of the facts of that case which are very different from

the facts here. There, the claimant was suffering, not from an occupational disease, but from tuberculosis, a germ disease, which he claimed the gases and vapors breathed by him in his place of employment had made him susceptible to, or that his natural resistance to that disease had been lessened by the hazards of his employment. Clearly, there, the claimant contracted a disease within the meaning of the workmen's compensation act, and he was properly excluded from the benefits of that act.

The repudiation of the doctrine of *Victory Sparkler & Specialty Co. v. Francks,* 147 Md. 368, 128 Atl. 635, seems to have been unnecessary, as it was based on an entirely different state of facts and is not against the holding in the *Depre* case. The *Depre* case does say that "there must be some unexpected or sudden happening." But, when read as a whole, it distinctly does not hold that the happening must be both unexpected and sudden. That would not be a correct definition of a fortuitous event. Webster defines the word fortuitous thus:

"Happening by chance or accident; coming or occuring unexpectedly, or without any known cause; chance; accidental; casual." Webster's New International Dictionary.

While a fortuitous event does include accident, and while accidents usually occur suddenly, their effect is not always at once apparent. The accident discussed in *Carpenter v. Pacific Mutual Life Ins. Co.,* 145 Wash. 679, 261 Pac. 792, was several hours or days in so developing its effects as to become known. And if hours or days, why not weeks or months, if the poison is of a slower nature? The principle is the same, whether the poison be slow or fast.

The position of the department, and perhaps of the medical profession, seems to be summed up in the

testimony of one of the department's expert witnesses, as follows:

"I could not say otherwise than it is chronic, and I do not see how it could be contended otherwise.

"It may be that the technical understanding of occupational disease would mean fairly close to that given by Doctor Benson, nevertheless, we, as medical men, have to accept conditions as they present themselves. And in such cases we just simply do not recognize them as accidents. They cannot be construed to be accidents, because it is clearly shown that the poison is entering the system gradually, going on over a period of months—weeks or months, and sometimes years, and we just have to accept it. There is not any getting away from it from a scientific, medical point of view, that I have ever been able to find."

The word "chronic" is used by the witness as the antithesis of acute and sudden, and the poisoning is called a disease simply and solely because it is slow in developing. We cannot believe that the legislature used the word "disease" in that sense or to cover that class of cases.

As we understand it, an occupational disease is one which is due wholly to causes and conditions which are normal and constantly present and characteristic of the particular occupation; that is, those things which science and industry have not yet learned how to eliminate. Every worker in every plant of the same industry is alike constantly exposed to the danger of contracting a particular occupational disease. No such condition is shown here. No poisoning took place in this particular plant until the employer ignorantly or negligently shut off the ventilation. None has occurred in like plants situated elsewhere. And when the trouble was located and corrected, no more poisoning took place in this plant. Hence we are forced to hold that the injuries have resulted from a fortuitous event.

No previous case of our own throws any light upon our present subject, and outside authorities, because of different statutory provisions, are not conclusive. But, as we read the cases from other states, the great weight of authority tends to support our present views. Among the many cases which might be cited are the following: *Victory Sparkler & Specialty Co. v. Francks, supra; King v. Buckeye Cotton Oil Co.,* 296 S. W. (Tenn.) 3; *Industrial Commission of Ohio v. Roth,* 98 Ohio St. 34, 120 N. E. 172; *Nicholson v. Roundup Coal Mining Co.,* 79 Mont. 358, 257 Pac. 270; *Dondeneau v. State Industrial Accident Commission,* 119 Ore. 357, 249 Pac. 820; *United States Fidelity & Guaranty Co. v. Industrial Commission of Colorado,* 76 Colo. 241, 230 Pac. 624. Some of these cases define occupational disease and differentiate it from accident in harmony with what we have already said, and the Montana case treats squarely of fortuitous event, the Montana statute being apparently identical with ours. All in their reasoning lend support to our views.

We conclude that the judgments appealed from must be, and they are affirmed. The state of the record here indicates that a remittitur should issue in each case, but costs will be taxed only in one.

PARKER and FRENCH, JJ., concur.