[No. 29048. *En Banc.* December 10, 1943.]

St. Paul & Tacoma Lumber Company, *Respondent,* v. The Department of Labor and Industries *et al., Appellants.*[1]

[1]Reported in 144 P. (2d) 250.

*The Attorney General* and *L. E. O'Neill, Assistant,* for appellant Department of Labor & Industries.

*Neal, Brodie & Trullinger,* for appellant Higgins.

*Grosscup, Morrow & Ambler,* for respondent.

MILLARD, J.—John S. Higgins, who continuously worked as a millwright for St. Paul & Tacoma Lumber Company from March, 1919, until June, 1941, died June 15, 1941, while on a railroad train enroute to Colorado with his wife, Jennie B. Higgins, on advice of several physicians to change his residence to a higher and drier climate. The Colorado death certificate states, as the immediate cause of death, "cardiac asthma—acute myocarditis." July 28, 1941, the widow filed with the department of labor and industries a claim for pension in which she alleged that her husband's death was the result of dust inhalation incident to his employment at the plant of his employer. March 20, 1942, the claim was rejected by the supervisor of the department on the ground that there was no evidence of an occupational disease, as contemplated by the workmen's compensation act; that the cause of death was acute myocarditis accompanied by cardiac asthma, a condition which was "brought about through natural causes and not through exposure to dust."

On rehearing, the supervisor was reversed September 28, 1942, by the joint board of the department, and an order was entered awarding a pension to claimant. The employer of deceased appealed from that order to the superior court for Pierce county.

Claimant's motion that department be required forthwith to pay to her the accrued benefits and pension to which she was entitled by the department's order, which the employer had not superseded, was denied.

Upon the same evidence (no evidence was introduced by department or employer at the rehearing by the joint board or on review of the order by the superior court) on which the department awarded a pension to claimant, the

trial court found that the death of the workman did not result from an occupational disease within the meaning of the workmen's compensation act, and entered judgment reversing the department's order and awarded to the employer an attorney's fee to be paid out of the administrative fund of the department. The department and claimant appealed.

■ Counsel for the department contend that, as there was substantial evidence to support the department's order, and there was no evidence introduced by respondent or the department, the trial court should have affirmed that order, in view of the statutory rule that the decision of the department is to be deemed *prima facie* correct and the burden of proof is upon the party attacking the decision. See *Purdy & Whitfield v. Department of Labor & Industries,* 12 Wn. (2d) 131, 120 P. (2d) 858.

This is not a situation where the *prima facie* correctness of the decision of the department on a question of fact is challenged. The department's findings of fact are in no essential different from the findings of fact made by the trial court. They differ only in the conclusion of law. The department concluded that the workman died as a result of an occupational disease, while the conclusion of the trial court was contrary thereto. Respondent employer sought in the trial court correction of the question of law, not the question of fact, which the employer contended the department had incorrectly decided.

The cause was tried upon the claimant's theory that she was entitled, under Laws of 1937, chapter 212, subd. 21, p. 1033, as amended by Laws of 1939, chapter 135, subd. 22, p. 385, to compensation for the death of her husband, whose death was caused by asthmatic bronchitis resulting from dust inhalation. Appellant department argues in this court that the 1941 statute (Laws of 1941, chapter 235, p. 772), which amended the above cited occupational disease statutes, is applicable, although that statute did not become effective until after the date Mr. Higgins had ceased em-

ployment with respondent employer, as the 1941 statute is merely declaratory of the legislative definition of occupational disease and supplements the prior statutes.

It is the position of appellants that the evidence was ample to sustain the department's finding that the workman was employed under conditions which brought him within the purview of the occupational disease act; that is, he was employed in an industry where intense dust prevailed and, as a result of the constant inhalation of such dust, he contracted a disease of the respiratory system which contributed directly to his death.

The finding of the joint board that the workman contracted an occupational disease of wood dust asthma from his employment resulting in his death is not sustained by the evidence. There is no evidence of probative value to remove the question of causal relation from the field of speculation and surmise.

Appellant widow testified that her husband had been working continuously for respondent employer since March, 1919, and that he had his first attack of serious illness in January, 1940; that for the past five or six years whenever he worked where it was dusty he would have smothering attacks and that whenever he rested from his work and kept away from the dust his condition improved, but that working in the dust at the mill caused him to cough and his breathing became more difficult, whereupon his physicians advised him to go to a drier climate. There was other testimony on the part of workmen, with whom the deceased workman was associated, that in the fuel house where Mr. Higgins was employed it was very dusty and the dust "caused him [Higgins] to do a lot of coughing." Those workmen, however, did not by reason of their exposure to the dust sustain any disability.

One physician testified that the deceased had received treatment for a number of years at a clinic in Tacoma and that the deceased had been attended personally by the testifying physician since 1939. He testified that an examination made by him of the deceased in 1940 disclosed that Mr.

Higgins had a chronic ailment of long standing and marked myocardial changes. Mr. Higgins suffered from acute illness for about two years prior to his death, particularly from pneumonia which twice in the year prior to his death necessitated confinement in a hospital. The record of the clinic, where the deceased received treatment until he departed for Colorado on his last journey, does not show any complaint of any disability from inhalation of dust. The physician testified further that he did not believe that the workman had a true "asthma," and that he did not believe that dust had any bearing on the case. He attributed the condition of Mr. Higgins to a progressively developing heart disease of natural origin. The opinion of this medical expert to some extent accords with the death certificate from the Colorado division of public health which recites as the cause of death "cardiac asthma—acute myocarditis."

The other physician witness, who is an allergy specialist, examined the deceased first in April, 1941, about two months prior to the death of the workman. He testified that he believed that Mr. Higgins was suffering from an allergy caused by his being "a person peculiarly over-sensitive to a certain substance or substances which may enter his body either in the air that he breathes or in the food that he eats." He further testified that skin tests (which were never made) and by the reaction of the skin of Mr. Higgins the offending substance, whether it were food, dust from feathers, animals, etc., might be detected. The case history of this workman, the physician testified, indicated the workman suffered less while away from work, but he would not conclude therefrom that the disease was the result of inhalation of dust at respondent's plant; that the skin tests would have revealed the causative factor of the asthma which may have been dust from wood or other products around him at work or possibly dust around his home or substances in his food in his diet.

"It would only be by the means of such tests that in this case it could be definitely determined as to whether his

occupation was the cause of his allergy in spite of the fact that the history seemed to suggest that."

Briefly, the testimony of this physician witness is that the death of Mr. Higgins was attributable to allergic bronchial asthma, but he went no further than to testify that he suspected that deceased was allergic to some substance connected with his employment. He gave a negative answer to the question whether, since the skin tests were not made to determine the cause of the worker's asthma, he was able to state the cause of the bronchial asthma from which Mr. Higgins suffered. The employees who worked side by side with Mr. Higgins for a number of years experienced no ill effects from their exposure to the wood dust. While the evidence would sustain a finding that the death of Mr. Higgins resulted from bronchial asthma caused by an individual over-sensitiveness to some particular substance, there is no evidence, nothing more than surmise, that that substance was wood dust.

In *Anthony v. National Fruit Canning Co.*, 185 Wash. 637, 56 P. (2d) 688 (which opinion was filed April 13, 1936), we held, citing our prior opinions to the same effect, that occupational diseases are not within the workmen's compensation act, because they do not constitute fortuitous events or happenings of a traumatic nature, which are the kind of injuries defined and embraced within that act. The legislature convened the following year and enacted our first occupational disease act (Laws of 1937, chapter 212, p. 1031; Rem. Rev. Stat. (Sup.), § 7679-1 [P. C. § 3472-21]), which provides compensation shall be payable for disabilities sustained or death incurred by an employee resulting from occupational diseases which may be divided into four general classifications. The first classification is that of occupational disease caused from handling some particular classes of substances in the industry which are enumerated as follows: Anthrax, lead poisoning, zinc poisoning, mercury poisoning, phosphorous poisoning, arsenic poisoning, benzol poisoning, carbon bisulphide poisoning, tetrachlor-methane poisoning, chrome poisoning, tar

poisoning, methyl chloride poisoning, carbon monoxide poisoning, sulphuric acid poisoning, dermatitis. The second classification of occupational disease caused from being engaged in work in a certain occupation enumerate the following: Compressed air; mining; glass work. The third classification is occupational disease caused from disability due to certain irritating processes enumerated as blisters or abrasions in a process involving continuous friction and burstitis or synovitis in a process involving continuous rubbing, pressure, or vibration of the parts affected. The fourth classification is occupational disease caused from working in any industry where intense dust prevails.

Following the enactment of the 1937 occupational disease act, the department of labor and industries issued a blanket order to employers fixing a uniform premium to be paid by each employer and employee subject to the act. In *Polson Logging Co. v. Kelly,* 195 Wash. 167, 80 P. (2d) 412, we held, citing with approval *Seattle Can Co. v. Department of Labor & Industries,* 147 Wash. 303, 265 Pac. 739, that an occupational disease is one which is due wholly to causes and conditions which are normally and constantly present and characteristic of the particular occupation. That is, before any disease may be classified in a legal sense as an occupational disease, it must be a disease or diseased condition which is peculiar to a given occupation and brought about by exposure to certain harmful conditions which are constantly present and to which all workmen in the occupation are continually exposed; that there were no occupational diseases named in Laws of 1937, chapter 212, to which the logging company's employees were or could be exposed on account of their occupation; therefore, the 1937 occupational disease act was inapplicable, as employees engaged in the logging industry were subject only to those diseases common to all employed people.

The occupational disease act of 1937 was amended by Laws of 1939, chapter 135, which did not change materially the meaning of the occupational disease act as construed in *Polson Logging Co. v. Kelly, supra.* Subdivision 21 of

the 1937 act, reading as follows (if taken literally it cannot mean anything as the enumeration purportedly is of occupational diseases), "and any persons employed in any industry where intense dust prevails," was clarified. Asbestosis and silicosis were defined by the 1939 statute in a new section (21) and certain conditions placed on recovery for those diseases. A new section (22) in the 1939 act provides for recovery for disability sustained or death incurred by an employee, resulting from the occupational disease defined as "any respiratory disease other than asbestosis or silicosis contracted through the inhalation of dust in any industry where intense dust prevails."

Conceding, *arguendo,* that the 1941 statute (Laws of 1941, chapter 235, p. 772, Rem. Supp. 1941, §§ 7679-1, 7679-2), which amends Laws of 1937, chapter 212, as amended by Laws of 1939, chapter 135, may be given a retroactive application the result would be the same, as the claimant has failed to establish that the workman contracted an occupational disease. The 1941 occupational disease statute defines "occupational disease" as "such disease or infection as arises naturally and proximately out of extrahazardous employment." The disease which caused the death of claimant's husband was not shown to be one which was due wholly to causes and conditions which were normal and constantly present and characteristic of his particular occupation; therefore, his death was not caused by an occupational disease. There is no substantial evidence that the workman's disease arose "naturally and proximately out of his employment."

The trial court did not commit error in awarding an attorney's fee to respondent employer. Any question as to the right of an employer, under the workmen's compensation act, to appeal from an order awarding compensation to workmen is foreclosed by *Mud Bay Logging Co. v. Department of Labor & Industries,* 189 Wash. 285, 64 P. (2d) 1054, 193 Wash. 275, 75 P. (2d) 579, in which we held that an employer has a right to appeal under Rem. Rev. Stat., § 7697 [P. C. § 3488], from a decision of the joint board if

aggrieved thereby. That statute (Rem. Rev. Stat., § 7697), which provides for a reasonable fee to be fixed by the court in the case, payable out of the administrative fund if the decision of the joint board is reversed or modified, clearly authorizes an attorney's fee to an employer who is successful in an appeal from the joint board.

Counsel for appellant claimant insist that the motion to require the department forthwith to pay to the claimant the accrued benefits and pension to which she was entitled by the order of the joint board should have been granted, as the order had not been superseded by the employer, and the only question presented by the employer's appeal to the superior court was whether the employer's cost experience should be charged with the claim or whether the class of industry as a whole, of which the employer was a member, should be so charged.

We are not unmindful of our opinion in *State ex rel. Crabb v. Olinger,* 196 Wash. 308, 82 P. (2d) 865, cited by counsel for appellant claimant, in which we granted a writ of mandate to compel the supervisor of industrial insurance to transmit voucher to the state auditor in payment of a claim. We held in that case that an appeal to this court from a judgment of the superior court will not stay proceedings on that judgment unless a supersedeas bond is given pursuant to Rem. Rev. Stat., § 1722 [P. C. § 7296]; therefore, in the absence of a bond superseding the order of which the employer complained in that case, and in view of Rem. Rev. Stat., § 7697, which granted to the employer the right of appeal but denied the right to supersede the order, the claimant could enforce payment by writ of mandamus of the compensation awarded; that such compensation should be paid without regard to the question whether the appeal of the employer may be successful.

Three judges concurred with the author of the opinion in the case cited, two judges concurred only in the result, stating no reason for their position, while three judges dissented on the ground that, when an appeal is taken from

any tribunal, that tribunal loses jurisdiction to act further and that the legislature intended that the language "except in the case last named an appeal shall not be a stay" in Rem. Rev. Stat., § 7697, be restricted in its application to Rem. Rev. Stat., § 7683 [P. C. § 3477].

"It simply means that, unless a bond is given within five days following service of notice of appeal, such appeal shall not operate as a stay of the order made by virtue of the authority of that section." (p. 331.)

At the common law, a writ of error operated *per se* as a supersedeas and prevented the issuance of execution. While that matter is now covered by statutory provision prescribing what judgments and orders may be superseded and upon what conditions, and, generally speaking, an appeal which does not fall within any of those statutes does not operate as a stay, it should be borne in mind that the superior courts of this state, in the exercise of their appellate jurisdiction, have all of the powers inherent in reviewing courts at the common law; hence, in its discretion a superior court may suspend the operation of a departmental order which it is reviewing in the exercise of its appellate jurisdiction.

We held in *State ex rel. Barnard v. Board of Education,* 19 Wash. 8, 52 Pac. 317, 67 Am. St. 706, 40 L.R.A. 317, that to maintain the existing status and to preserve the fruits of the litigation to an appellant (respondent employer in the case at bar has a material interest, as it is concerned in preservation of the accident fund), we have, under § 4 of Art. IV of the state constitution, in aid of our appellate jurisdiction and in the exercise of our discretion, authority to grant a supersedeas pending the determination of an appeal, and that we may do so although the appellant is not, as a matter of right, entitled to a supersedeas under any existing statute. This constitutional power cannot be wholly taken away by statute.

The superior court, on an appeal to it from the department, is a reviewing court. In the exercise of that appellate jurisdiction, the superior court has inherent power—

no constitutional grant of such power is necessary—to suspend the operation of the department's order pending disposition of an appeal therefrom to the superior court.

■■ True, an appeal to this court from a judgment of the superior court will not stay proceedings on that judgment unless a supersedeas bond is given. The constitutional and/or inherent power of a reviewing court to grant a writ of supersedeas when necessary to preserve the rights of the parties pending an appeal may be subject to legislative regulation, but of that power it cannot be wholly divested by the legislature. The statute (Rem. Rev. Stat., § 1722) which provides that a judgment debtor may stay an execution is in harmony with the foregoing. Obviously, there is no necessity for supersedeas in cases of this character, as the preservation of the trust fund (accident fund), which is in custody of the state, may be effectuated by the court's suspension of the operation of the department's order making the award pending disposition of the appeal from that order to the superior court. *State ex rel. Crabb v. Olinger, supra,* should be and it is hereby overruled.

The judgment is in all respects affirmed.

SIMPSON, C. J., BEALS, STEINERT, and ROBINSON, JJ., concur.

GRADY, J. (dissenting)—I am unable to concur in the foregoing opinion wherein it is stated that the conclusion to be drawn from the evidence submitted to the joint board is one of law and not one of fact, and that the finding of the joint board that the workman contracted an occupational disease of wood dust asthma from his employment, resulting in his death, is not sustained by the evidence; also, that any causal relation between the occupational disease and the death of the workman rests in speculation and surmise. I very much fear that the opinion will be construed as holding, in effect, that the sawmill industry, in so far as occupational diseases caused by intense dust are concerned, is not covered by subd. 22 of § 1 of chapter 135 of the Laws of 1939, p. 385 (Rem. Rev. Stat. (Sup.), § 7679-1), the same

as was held in *Polson Logging Co. v. Kelly*, 195 Wash. 167, 80 P. (2d) 412, with reference to chapter 212 of the Laws of 1937, p. 1031, as applied to the logging industry. We should not create such a situation because it is apparent the legislature did not so intend.

When the legislature of 1939 convened, it had before it the *Polson* case and other cases defining occupational diseases. It recognized that, in certain industries, if intense dust prevailed in their operations, or in the operation of any part or department thereof, there might be caused respiratory diseases by reason of the inhalation of such dust; and the act of 1937 was amended by adding to § 1 thereof the following subdivision: "(22) Any respiratory disease other than asbestosis or silicosis contracted through the inhalation of dust in any industry where intense dust prevails." The excepted diseases are covered by subd. 21.

Subdivision 22 is plain and unambiguous and needs no further judicial definition. Any workman (other than those referred to in the remainder of the section) who is employed in any industry in doing the work to which he is assigned and comes in contact with intense dust and, as a result of inhaling it, contracts a respiratory disease, is entitled to compensation; and, if death results, the named beneficiaries are entitled to benefits.

In the application of the 1939 act, neither the department nor the courts are any longer concerned with what the judicial definition of an occupational disease may have been, as the legislature has classified and defined them, and all must be guided thereby. In this case, when Mr. Higgins died, all the department of labor and industries had to determine was whether he had been (1) employed in an industry where intense dust prevailed in the place or places therein in which he worked; (2) that, in his work, he inhaled dust; and (3) that, by reason thereof, he contracted a respiratory disease which later caused his death.

At a hearing had before the joint board, it appeared that the deceased commenced to work for the St. Paul & Tacoma Lumber Company in March, 1919, and worked continuously

up to about January, 1941. He was a millwright and did the repair and maintenance work in the different departments of a sawmill operated by his employer. His duties required him to work from time to time on what was termed cyclones, or dust collectors, when they became plugged. The conveyors would have to be repaired. Dust was blown from the planing mill to the fuel room. Dust also came from a broom handle factory. This was a fine dust caused by the sanding of the broom handles.

The necessity for repair and maintenance work in and about these several places brought the deceased in frequent contact with intense dust and, in many instances, for considerable periods of time. He had a nasal difficulty which impaired his ability to breathe through his nose, and, as a result, he breathed mostly through his mouth. In 1933 or 1934, the deceased commenced to have what his wife called "smothering attacks," which would follow his work at "an especially dusty job," and he would have to sit up to breathe. Gradually, he developed a cough and further difficulty in breathing and sleeping. This was followed by bronchial difficulties and by what a medical witness called "asthmatic bronchitis." The time came when he found it necessary to take a rest after working in a dusty place. In January, 1940, and again in January, 1941, the deceased was in a hospital suffering from pneumonia. He complained that working in the dust "hurt" him and affected his throat and lungs. His condition became progressively worse, and physicians recommended that he seek a higher and drier climate. He was not able to perform his work after his illness in January, 1941. In June, 1941, he left for Colorado, and, while on the train, he died.

The joint board heard the testimony of two physicians. One of them had assisted in the medical treatments given to the deceased over a considerable period of time. He stated that the deceased had been affected with asthmatic bronchitis, which could have been caused by upper respiratory irritation, and the irritation could have been caused by his working in intense dust, and this could have aggravated his

condition. He stated the respiratory condition was associated with a cardiac condition. He minimized somewhat the probability of the dust causing any trouble because of its stoppage by the nasal cavities. However, he did not take into consideration that the deceased had a stoppage of the nasal cavities and breathed largely through his mouth, but he did admit that there would be an aggravation of the nasal mucosa, which might cause upper respiratory infection, which might, in turn, aggravate the chest and thus create a descending infection. He further stated that, if the deceased experienced further difficulty in breathing, the chronic cardiac condition he found to exist would be affected because of the greater load that would be put upon the heart, and, as the difficulty in breathing progressed, so would the cardiac condition.

The other physician thought the deceased might have been allergic to the dust he contacted in doing his work, and that this had caused his respiratory troubles, but he could not give it as his opinion because of the lack of having skin tests made. He believed from the history of the case as given him and what examination he had made that the condition of the deceased was consistent with bronchial asthma, rather than cardiac asthma, and that this very definitely contributed to his death. He stated that this usually started with a slight irritation and progressively grew worse when there was a continued contact with causative substances; also, that it is not at all unusual for one to be exposed to a certain condition and not develop symptoms of sensitivity for a long time. The witness was examined at some length as to bronchial asthma and cardiac asthma, and the greater probability of one following work in the lumber industry than the other, but this led to no definite result, and the witness finally closed his testimony by stating that bronchial asthma is an "individual proposition going solely with the individual, rather than with any industry."

The coroner (a physician) who examined the deceased to determine the cause of his death made no autopsy, but

certified that his death was caused by cardiac asthma. One of the physicians stated, however, that, even with a full account on the past history of the deceased, one could not definitely diagnose the cause of death as cardiac asthma without an autopsy, and followed this by giving his opinion that, in view of the types of symptoms and their continuation over a period of time, bronchial asthma very definitely contributed to the death of the deceased.

In view of all the testimony given both by laymen and by experts, the joint board reached the factual conclusion that the deceased had contracted an occupational disease of wood dust asthma from his employment, resulting in his death.

Our statute, Rem. Rev. Stat., § 7697, provides that, in all court proceedings, the decision of the department shall be *prima facie* correct and the burden of proof shall be upon the party attacking the same. This statutory rule has been expressed in many of our decisions. In applying the statute, this court has made statements from which it might be inferred that factual conclusions as to cause of death from injury must come from medical men. But it seems to me that, when these cases are critically read, there was a situation presented in each of them that the court felt the factual conclusion of the medical men as to a particular result was not overcome by the testimony of nonexperts. I do not think this court has ever said or intended to convey the impression that the trier of fact in the industrial insurance cases cannot adopt and base a finding of fact upon nonexpert testimony. In this case there are both.

It seems to me that the employer wants this court to adopt the view that the deceased had an over-sensitiveness to wood dust, but, as he was not a victim of any peculiarity of the lumber industry and did not die as the result of any operation in that industry where "intense dust" prevailed, his death was not the result of any occupational disease.

The act of 1939, in enumerating what are occupational diseases, includes respiratory diseases contracted through the inhalation of dust in any industry where intense dust

prevails. It does not draw any distinction between individuals who may be sensitive to dust and those who may not. Nor does it specify that the dust must be of a poisonous character or that its quantity be such that it will produce any particular result. The social objective to be attained is to compensate for the result following the inhalation of dust, the only qualification being that the prevalent dust be intense.

We have often decided in the "heart cases" that, even though a person, by reason of a weakened heart condition, be more susceptible to the effect of physical exertion than those with normal hearts, this fact does not deny him the right to compensation. *McCormick Lbr. Co. v. Department of Labor & Industries*, 7 Wn. (2d) 40, 108 P. (2d) 807, and cases cited and reviewed therein. There is close analogy between those cases and this one in the application of the principle that the industrial insurance act protects the weak as well as the strong. It would seem strange, indeed, that, in view of the statute, an employer could have the benefit of the services of an employee over a long period of time in a dusty class of work and because, by chance, it affected him in a greater degree than it did others and he became afflicted with a respiratory disease, he should be denied the benefits of the act.

The evidence, in my opinion, leads to no other reasonable factual conclusion than that the deceased, by reason of his long and constant inhalation of wood dust, had contracted a respiratory disease, which greatly increased the work his heart had to do, and this finally reached a climax, the heart ceased to function, and he died. The joint board did not decide any legal question or arrive at any legal conclusion, as we are invited to hold. It drew a factual conclusion, and, I think, a correct one. I think the trial court was in error in rejecting the factual conclusion the department drew from the evidence submitted and that the judgment should be reversed.

This result would make it unnecessary to decide the other two questions—whether an employer who has appealed

from a decision of the department is entitled to have an attorney's fee allowed him, and whether the case of *State ex rel. Crabb v. Olinger,* 196 Wash. 308, 82 P. (2d) 865, should be overruled, and their decision should be left until some case comes before us in which they are directly involved.

BLAKE, JEFFERS, and MALLERY, JJ., concur with GRADY, J.

