BERNICE M. MCNAUGHT, APPELLANT, v. NEW YORK
LIFE INSURANCE COMPANY, APPELLEE.
9 N. W. (2d) 160

FILED APRIL 16, 1943. No. 31523.

*Floyd E. Wright,* for appellant.

*Brown, Crossman, West, Barton & Fitch, contra.*

Heard before SIMMONS, C. J., PAINE, CARTER, MESSMORE, YEAGER, CHAPPELL and WENKE, JJ.

PAINE, J.

Bernice M. McNaught, widow and beneficiary of William C. McNaught, deceased, brought an action upon the double indemnity agreement attached to a life insurance policy for $1,000. At the close of plaintiff's evidence, the court sustained a motion for an instructed verdict for the defendant. Plaintiff appeals.

The petition alleged that on September 26, 1934, the defendant company issued a policy of insurance on the life of William C. McNaught for the sum of $1,000, payable to his wife, and that said policy contained an additional double indemnity agreement, providing that for an additional quarterly premium of 27 cents the beneficiary would be paid double indemnity in case of the death of the insured through external, violent and accidental means.

The petition alleges that William C. McNaught died in Omaha on September 17, 1940, said policy and double indemnity agreement being in full force and effect; that his death resulted from a pulmonary emboli, caused by an injury sustained on August 11, 1940, when the insured was, without provocation, assaulted while sitting in his automobile. It is alleged that proofs of death were furnished to the company about October 25, 1940, and claim was made for the payment of $1,000 by reason of said double indemnity provision of said policy; that defendant paid to plain-

tiff the sum of $1,000 under the regular provision of said policy, but refused to pay the further sum of $1,000 due under the double indemnity provision.

Defendant's amended answer alleged that the double indemnity provision in the policy of plaintiff provided that the sum of $1,000 was payable "Upon receipt of due proof that the death of the Insured resulted directly and independently of all other causes from bodily injury effected solely through external, violent and accidental means," and said double indemnity provision further provided "that such double indemnity shall not be payable if Insured's death resulted, directly or indirectly, from * * * (h) illness or disease."

To this amended answer a reply in the way of a general denial was filed.

The issues involve but two questions: First, Did the insured suffer an accident at North Platte about a month before he died? Second, If so, was that accident the cause of his death?

The evidence discloses that the insured was the traveling representative of the Mankato Brewing Company, and in the middle of August made one of his regular trips to North Platte, where he registered at the Palace Hotel.

Homer R. Pease, the clerk, testified that McNaught had been coming there for several years, and that he registered in on August 6, 1940, and checked out on August 13; that he had a conversation with McNaught in the lobby on the afternoon of the 11th of August, and that he made no complaint of having received any injuries. But about 9:30 on the morning of the 12th, the day before he checked out, McNaught came to the lobby and asked the clerk to go to his room to rub some lotion on some injuries. He had a black and blue mark on the upper forearm near the elbow, about the size of a silver dollar. There was also a black and blue spot above the left eye, and also a bruise on one of his legs, which caused a slight limp. The clerk said he put on no bandages, but just rubbed the lotion on the arm and leg. He said he could not tell whether the bruises were of long

standing or just recent. He said on the evening of the 12th McNaught's wife came down, but did not register, as they compliment the wife of a traveling man.

On cross-examination he testified that he did nothing to the bruise on the eye, which was just a break in the skin which did not seem bad. It was stipulated that, after Mr. Pease had examined the hotel register, he would testify that they checked out on August 16, instead of the 13th, as previously testified to by him.

The plaintiff testified she came down to North Platte on Thursday, August 15, 1940, from Scottsbluff, where she had visited her parents, but she and her husband had been living in Omaha since March, 1940. She described the bruises on her husband, and that the one on the arm was painful, and the discoloration lasted several weeks. She said that on August 17 they drove to Omaha, stopping at Grand Island for mail. On the night of September 7 her husband became ill, and was taken to the Lutheran Hospital September 8, and remained in the care of Dr. McGee there until he died, September 17.

On cross-examination, she said the bruise on his arm had entirely disappeared before he became ill, by gradually fading out.

Dr. John W. McGee, a licensed physician since 1925, was called to see deceased September 8, 1940, at his home, and stayed several hours, as he was very seriously ill, and he thought he was going to die, and had him removed to the hospital, where he died on September 17. The cause of death was emboli, following sharp chest pains.

Dr. Mallott, of Scottsbluff, testified from an examination of the hospital chart that he died from coronary embolus, most likely derived from this discolored patch in his arm or elbow.

Some 21 photostatic copies of all the hospital charts appear as exhibits. Dr. Dahlstet, probably an interne, took down a history when deceased arrived at the hospital. It recites that he was a well-developed male, 36 years old, weight 180 pounds, six feet tall, who came to the hospital

for relief from pain in lower left chest, thought by patient to be pleurisy; later it recurred, accompanied by dyspnea (which means difficult breathing). Patient said he had always been well and active until present symptoms appeared.

One chart gives as onset of the disease: "About Sept. 8, pt noticed sharp stabbing pain in lower left chest. This pain, at first somewhat localized, later extended thru entire chest & lasted for about an hour's time. Later it recurred, accompanied by dyspnea, temperature & perspiration."

The chart describing patient's death reads as follows: "9-17-40 Pt while being taken from bed pan suddenly complained of pain in chest (12 midnite) and not able to get air ect Face became cold and clammy and respiration increased. Was pulseless. In spite of stimulants and nasal oxygen he became weaker and expired at 12:30 a. m. Cause of death cardiac decompensation or possibly coronary occlusion."

We have now reviewed the important portions of the evidence of the plaintiff. Thereupon, the plaintiff rested. The trial of the cause began on November 24, 1941, and on the following day the court, pursuant to a ruling on motion for directed verdict, instructed the jury in open court to return a verdict for defendant, and pursuant to said instructions the jury rendered a verdict for the defendant and against the plaintiff, and the jury were thereupon discharged. Motion for new trial overruled. Plaintiff appealed.

In support of a reversal, the plaintiff insists that accidental death may be shown by circumstantial evidence.

In reviewing a direction to the jury at the close of plaintiff's evidence to return a verdict in favor of defendant, the appellate court will assume the existence of all material facts favorable to the plaintiff which competent evidence on behalf of plaintiff establishes or tends to prove, and give her the benefit of every reasonable inference therefrom. See *In re Estate of Hoagland,* 126 Neb. 377, 253 N. W. 416; *Zielinski v. Dolan,* 127 Neb. 153, 254 N. W. 695; *Andrews v. Clapper,* 133 Neb. 110, 274 N. W. 209; *Zimmer v. Brandon,* 134 Neb. 311, 278 N. W. 502.

This court has said that where evidence, if uncontradicted, would support a verdict, it is the duty of the court to submit the case to the jury. "It is not the function of the court to weigh the evidence for the purpose of saying how the verdict should go." *Blackwell v. Omaha Athletic Club*, 123 Neb. 332, 242 N. W. 664.

With these rules in mind, we will examine the strongest case submitted by the plaintiff. It is *Hornby v. State Life Ins. Co.*, 106 Neb. 575, 184 N. W. 84. In this case the opinion was written by Flansburg, J., in 1921, and the facts may be stated briefly as follows:

The injured and his son were engaged in harvesting a crop of beans near Valentine in October, 1918, and the field was badly infested with sandburrs. There is no direct testimony of the insured getting a sandburr in his finger, or of any complaints made by him, but the evidence of his wife showed that during the harvest, or shortly after, as the son says, the insured was observed pressing and picking at his thumb, and his son looked at the thumb, "and there appeared to be a small hole, a place like a thorn leaves after it has gone in, and that just about the little red spot in the center the skin had turned red and that a sort of callous had formed about the place." Later the thumb was swollen, then infection caused the whole arm to swell, and the insured died November 17 of blood poisoning, and recovery was allowed in this court for accidental death, on a rider for double indemnity attached to the policy.

In this case the insured's thumb was pierced by a foreign substance; the wound and the nature of it were proved. He was injured by violent external means. The wound gradually caused increasing difficulty, spreading up from the thumb; it became infected, and the insured, as a direct result thereof, died of blood poisoning. There was no presumption on a presumption, and yet Judge Letton dissented, showing that the case was a close one.

Now, in the case at bar, the fact that Mr. McNaught died a month after he had, in some manner not disclosed in the evidence, received certain black and blue spots, as hereto-

fore described, does not even raise a presumption that his death was an accidental death under the strict provisions of the policy agreement upon which suit is brought in this case.

The hotel clerk rubbed liniment on black and blue spots on the elbow and leg of deceased; he did not know how long the spots had been there. He rubbed nothing on the abrasion above the eye. The wife testified that these spots had all cleared up. Neither to his doctor nor to the interne did he mention these bruises, occurring a month before, when he gave the history as found on the charts in the hospital. Dr. Whitehead, house physician, who wrote up the facts about the death, said it was caused by cardiac decompensation or possible coronary occlusion. Direct evidence is lacking to establish any connection between the injuries and death.

"The court rightly refused to submit to the jury the issue of the death of the insured as the result, directly and independently of all other causes, of bodily injuries sustained through external, violent and accidental means, and not the result wholly or partly by disease, or by bodily or mental infirmity, because the evidence, on that issue, left its determination wholly to guess or conjecture—the burden of proof being on plaintiff." *Plotke v. Metropolitan Life Ins. Co.*, 210 Minn. 541, 299 N. W. 216.

"Where the evidence is insufficient to support a verdict for plaintiff, the court should sustain defendant's motion to direct a verdict." *Lebs v. Mutual Benefit Health & Accident Ass'n*, 124 Neb. 491, 247 N. W. 19.

"In action to recover additional indemnity on life policy, beneficiary had burden of proving that insured's death was accidental, in order to recover accidental death benefits." *Hoholik v. Metropolitan Life Ins. Co.*, 286 N. W. 228 (289 Mich. 242).

"If a particular fact upon which a presumption is required to be based is not shown to exist, then the presumption cannot be indulged." *Smith v. Fall*, 122 Neb. 783, 241 N. W. 560. See, also, *Coulter v. Cummings*, 93 Neb. 646,

142 N. W. 109; *Adamek v. Tilford*, 125 Neb. 139, 249 N. W. 300.

"The court having determined that the plaintiff failed to make out even a *prima facie* case, it is not necessary for the court to allow the case to proceed further." *Schroeder v. Bartlett*, 129 Neb. 645, 262 N. W. 447. See, also, *Swain v. Cogswell*, 130 Neb. 709, 266 N. W. 581; *Swett v. Antelope County Farmers Mutual Ins. Co.*, 91 Neb. 561, 136 N. W. 347.

In our opinion, the evidence was not sufficient to authorize the court to submit the case to the jury. The action of the trial court in directing a verdict for defendant is hereby affirmed.

AFFIRMED.

The following opinion on motion for rehearing was filed November 19, 1943.

Heard before SIMMONS, C. J., PAINE, CARTER, MESSMORE, CHAPPELL and WENKE, JJ.

PAINE, J.

This was an action brought by the widow and beneficiary of deceased upon the double indemnity agreement in a life insurance policy of $1,000 for accidental death. The trial court instructed a verdict for defendant. Plaintiff appealed.

On April 16, 1943, an opinion was released by this court affirming the judgment of the trial court, which opinion is found, *ante*, p. 213, 9 N. W. (2d) 160. Upon motion and brief for rehearing being filed, a journal entry was entered by this court on June 4, 1943, reading as follows: "It is by the court ordered that oral argument be, and hereby is, allowed on motion for rehearing herein, at session of court commencing September 20, 1943, with special reference to sufficiency of expert evidence in form of answer to hypothetical question as raising a jury question." The said case having been reargued, and the court having reached the conclusion that the former opinion of affirmance is wrong, it is hereby set aside and this opinion duly entered in said case.

The defendant company issued a policy of life insurance to William C. McNaught in the sum of $1,000, payable to his wife, the plaintiff herein, as beneficiary. Upon plaintiff filing proofs of death, the defendant company paid the life insurance due under said policy in the sum of $1,000. There was attached to said policy a double indemnity rider, for which an additional premium of 27 cents a quarter was paid, which provided, in brief, that the defendant company would pay an additional $1,000 upon proof of death of insured resulting, directly and independently of all other causes, from bodily injury effected solely through external, violent and accidental means, and occurring within 90 days after such injury.

To this petition, based upon this double indemnity rider, the defendant company filed an answer, admitting that the deceased died September 17, 1940, on which date the double indemnity provision was in full force and effect, and alleging briefly that said double indemnity contract provided that it should not be payable if the insured's death result-

ed, directly or indirectly, from illness or disease, and denying that deceased came to his death as the result of bodily injury, but alleging that his death resulted from illness and disease.

The court will therefore consider these questions: First, did the insured suffer an accident at North Platte in August, 1940? Second, if so, was that accident the cause of his death? Third, when plaintiff rested had she made a case which entitled it to go to the jury?

The evidence relating directly to these questions may be briefly summarized as follows: The deceased was a traveling man, whose territory was the whole state of Nebraska, and who had made regular trips to North Platte for several years, staying at the Palace Hotel when in town. About 9:30 on the morning of August 15 or 16, 1940, deceased asked the clerk to go to his room and rub some lotion on some injuries. At that time he had a black and blue spot above the left eye, a bruise on one of his legs, which caused a slight limp, and a black and blue mark on the upper forearm near the elbow, and the clerk rubbed the lotion on the injured arm and leg.

The plaintiff testified that she had been visiting her parents at Scottsbluff, and went to North Platte to meet her husband and ride to their home in Omaha with him; that she arrived on the afternoon train, and went to the Palace Hotel, and when he was undressing at about 11 o'clock that night she noticed a skinned place on one of his legs, and a bruise on his left arm below the elbow, and another on the right chest just below the collar bone; that the bruise on the arm was a very dark bruise on the inner arm, about the size of the palm of her hand, and that the bruise on the chest was smaller and not as deeply discolored, and that the bruise on the arm was painful. She was not permitted to testify as to what her husband had told her as to how he received the injuries, but testified that on Saturday, August 17, they drove to Omaha, and the discoloration remained on his arm for several weeks; that on the night of September 7 deceased complained of a severe pain in his shoulder and chest.

Dr. John W. McGee testified that he was called to the McNaught home on September 8, 1940, and stayed several hours, and he thought the deceased was going to die; that he diagnosed his condition as emboli, probably of the chest; that deceased was complaining of terrific pain, especially in the right chest. Dr. McGee testified as follows: "Q. Did he remain at his home or did you send him to the hospital? A. I remained—as I recall, I saw him about sometime early morning, eight or nine o'clock. I stayed with him until about noon, and I came back and saw him about four and I thought he should be taken to the hospital at that time. This thing started as a tremendous thing right off the bat." Dr. McGee further testified: "Q. For the purpose of the record, what is an emboli? A. An emboli is a small clot that can get into the blood stream and float around and get in any portion of the body, usually lodges in end arteries or arteries that have no communicating vessels. If they block the artery then that portion of the body that is blocked will get no more blood supply. Q. What other action can occur from the blood clots? A. If it hits, a vital area you die. Q. What do you mean by a vital area? A. If it hits coronary artery it disturbs the action of the heart enough to stop it. If it would hit an end artery like the brain, like a respiratory center, it would stop it right there. In my death certificate I said the primary cause of death was pulmonary emboli but this man had coronary emboli too."

Dr. Ralph J. Mallott, a physician and surgeon practicing at Scottsbluff, and a graduate of Northwestern University at Chicago, was called as a witness and testified that he had been acquainted with the deceased, and had attended him as his physician in February or March before his death; that he knew him quite well. He examined the exhibits giving a complete history of the case from the time the deceased entered the Lutheran Hospital at Omaha on September 8 to the time of his death, and he was then asked this hypothetical question: "Now, Doctor, assuming that on or about the 12th or 15th of August, 1940, that Wm. Mc-

Naught received an injury to his left arm in the vicinity of the left fore-arm in the vicinity of the elbow, which was painful the next day or so and became discolored, the size of the discoloration being about the size of the palm of Mrs. McNaught's hand, and that this discoloration remained on the arm from two to three weeks and then on September 7, 1940, Mr. McNaught became ill and suffered with severe pain in the chest, and, considering the hospital charts, the exhibits 'A' and 'A-1' to 'A-20,' which you have examined, do you have an opinion as to what caused the death of Mr. McNaught on September 17, 1940? * * * Mr. Mothersead: Just a moment. I object to that as incompetent, irrelevant, immaterial, assuming facts not shown and not the proper basis for a hypothetical question." The objection was over-ruled, and the answer of the witness was "I do." "Q. You may state your opinion as to the cause of his death from those facts that have been given you in the last question. A. I think he died from coronary embolus, most likely de-rived from this discolored patch in his arm or elbow. Mr. Mothersead: We move to strike the latter part as specula-tive. The Court: Overruled. Q. What is embolism? A. Well, it's a foreign body that travels in the blood stream. It may be a portion of a clot; it may be oil; it might be any-thing that was able to float in the blood stream and got in the blood stream. * * * Q. Where would this blood clot come from, in your opinion? A. From that discolored area on his arm. Q. Can you explain how that would happen? A. Well, whenever a body is struck with anything of any intensity it ruptures small blood vessels in the muscles and tissues; injury to those vessels. creating an extravasation of the blood—a pouring out of the blood in the tissues, which clots and may either be absorbed partially or entire-ly, or, may remain in place for some considerable time, but a clot too friable is easily broken and some subsequent jar or injury may dislodge a portion of it; if it is near a ves-sel that will take it it may circulate in the blood stream un-til it gets to a point where it can't go any farther; it is stopped by the size of the vessel or a forking of the vessel

and the emboli is stopped then. Q. Would the discoloration of Mr. McNaught's arm indicate anything as to whether or not a blood clot could come from that vicinity? A. Yes, sir, it would make it most likely that it could. Q. What would that discoloration indicate? A. Hemorrhage in the deeper tissues of the arm, beneath the skin."

With this summary of the evidence before us, we will consider some of the legal propositions submitted by the appellant.

Since the last argument in the case at bar, we have received additional authorities from the defendant's counsel, insisting that the hypothetical question asked of Dr. Mallott contained a statement upon which there is no proof, viz., that deceased received an injury to his left arm, and that because of the use of the word "injury" the question is improper and the answer should have been stricken.

There was abundant proof that there was a black and blue spot of considerable size on deceased's arm near the elbow, that it was painful to the deceased, that it remained there for several weeks. Such black and blue spot in such a location was referred to in the evidence as a contusion, and the court and the jury would take notice that ordinarily such a spot is accidentally received, and not self-inflicted, and we do not believe that the use of the word "injury" in this hypothetical question made it prejudicially defective.

This court has held, in an action based on the double indemnity rider for accidental death, when blood poisoning followed the piercing of insured's thumb by a sandbur: "In a suit on an insurance policy, covering death caused by violent, external and accidental means, where the proof reasonably shows that an injury was produced by violent and external means, and where there is no ground for suspicion that the wound was intentionally inflicted, there is a presumption that the insured did not voluntarily inflict the injury upon himself, and it is presumed that the injury was the result of accident." *Hornby v. State Life Ins. Co.*, 106 Neb. 575, 184 N. W. 84, 18 A. L. R. 106.

Therefore, from the evidence in the case at bar, we believe that the jury might have concluded that the deceased did suffer an accident at North Platte in August, 1940, and that there was no prejudicial error in using the words "an injury" in the hypothetical question set out herein.

This court, in line with many others, has often held that it is improper to permit an expert to give his opinion on the ultimate fact to be determined by the jury. We will examine two cases cited to us.

In *Neal v. Missouri P. R. Co.*, 98 Neb. 460, 153 N. W. 492, District Judge Leslie had refused to allow a fireman to express an opinion as to where a fire started in a one-story building. This ruling was affirmed by this court, and it was said that the jurors were as competent as the fireman to draw a conclusion.

In another Nebraska case, *Read v. Valley Land & Cattle Co.*, 66 Neb. 423, 92 N. W. 622, it was also held improper for an expert to give his opinion on the ultimate fact, which in this case involved an experienced ranchman being asked to give the amount of plaintiff's damage for loss of cattle in a storm under certain conditions.

It is said in Rogers, Expert Testimony (3d ed.) 88, sec. 48: "The experts' opinion is properly received when the subject is one of science or skill 'or one of which observation and experience have given the opportunity and means of knowledge which exists in reason rather than descriptive facts, and, hence, cannot be intelligently communicated to others not familiar with the subject so as to possess themselves of a full understanding of it.'"

"Nor is it a valid objection to opinion evidence that the opinion covers the whole ground of the inquiry, which the jury are to decide, if the case is one to be wholly resolved by opinion evidence." *Fireman's Ins. Co. v. J. H. Mohlman Co.*, 91 Fed. 85.

If there is a true invasion of the province of the jury, the opinion of a medical expert is inadmissible. "But the only rule which may be adduced is that the opinion should be admitted where it is necessary and advisable as an aid

to the jury, and excluded where it is not reasonably necessary and could but tend to confuse." 3 Jones, Evidence (2d ed.) 2460, sec. 1346.

For example, in one case scars from acid burns on the plaintiff's body were shown to the jury, but the effect of these acid burns, not being a matter of common knowledge, did not preclude expert testimony from the jury. See *American Agricultural Chemical Co. v. Hogan,* 213 Fed. 416.

While the opinion evidence rule is intended to protect against the danger of invasion of the province of the jury, the court should, as far as possible, ordinarily exclude the inference, conclusion, or judgment of the witness as to the ultimate facts in issue. But the rule is not absolute, for it frequently occurs that the only possible or practicable method of making proof of the fact in issue is by means of opinion evidence. If found by the trial court to be of aid to the jury, an opinion may be admitted notwithstanding it bears directly on the main issue. See 32 C. J. S. 74, sec. 446; *Lehman v. Knott,* 100 Or. 59, 196 Pac. 476; *Updegraff v. Gage-Hall Clinic,* 125 Kan. 518, 264 Pac. 1078; *Industrial Commission v. Holman,* 40 Ohio App. 426, 179 N. E. 192.

Justice Hunt, years ago, in writing an opinion adopted by the United States supreme court, very tersely set out the situation involved in these cases: "The witness was an expert, and was called and testified as such. His knowledge and experience fairly entitled him to that position. It is permitted to ask questions of a witness of this class which cannot be put to ordinary witnesses. It is not an objection, as is assumed, that he was asked a question involving the point to be decided by the jury. As an expert, he could properly aid the jury by such evidence, although it would not be competent to be given by an ordinary witness. It is upon subjects on which the jury are not as well able to judge for themselves as is the witness that an expert as such is expected to testify." *Transportation Line v. Hope,* 95 U. S. 297, 24 L. Ed. 477.

"Generally speaking, properly qualified physicians and surgeons may testify as experts upon all medical questions

connected with the practice of their profession. Thus, a physician may give his opinion as to the means or cause of death; or that the insured was afflicted with a certain disease; or that a certain internal condition resulted from external violence." 8 Couch, Cyclopedia of Insurance Law, sec. 2196.

"A very liberal practice is indulged in permitting opinion testimony of experts on matters in the field of medical practice. A duly qualified physician may state, upon the basis of facts set forth in proper hypothetical questions * * * his opinion as to the nature of the disease or disability from which a person is or was suffering, as to the facts or causes which probably produced, or might have produced, such condition, as to how injuries or wounds were inflicted, * * * as to when and where a disease was contracted, as to the general effects of an ailment or injury * * * and as to the probable or possible cause of death." 20 Am. Jur. 722, sec. 862.

"The admissibility of expert testimony is a question for the court, while its weight is a matter properly evaluated by the jury. In determining whether the conclusions or opinions of either an ordinary or an expert witness are admissible, the court must exercise a large measure of discretion." 20 Am. Jur. 670, sec. 798.

Dean Wigmore says the expert is not trying to usurp the function of the jury, because the jury may reject his testimony and accept his opponent's, and not even the judge's orders can compel them to accept the witness' statement against their will. "This bugbear, vigorously denounced with sentimental appeals to the value of jury trial, has been made to serve again and again as the dreadful source of those evils which the hypothetical question enables us to avoid." 2 Wigmore, Evidence (3d ed.) sec. 673.

In the case of *Horst v. Lewis*, an opinion upon rehearing was written by Holcomb, C. J., and appears in 71 Neb. 370, 103 N. W. 460. A widow secured a judgment because of the death of the husband. A physician was permitted to testify that the wounds were sufficient to produce death,

and it was contended that the court erred in not striking out this testimony, for it involved only such facts as come within the ordinary observation of all, and was thus an invasion of the province of the jury; but this court held: "Expert evidence is permitted where the facts under investigation are such that the witness is supposed, from his experience, skill and study, to have peculiar knowledge upon the subject of inquiry, which jurors generally do not possess."

In the annotation, 136 A. L. R. 967, citations are found from the federal courts, and from more than half of the states of the Union, supporting the rule that the opinion of a medical expert as to the cause of death is admissible on the ground that such witness has peculiar knowledge or skill, where the subject-matter is not one of common observation and knowledge, and where men of science are more competent to reach an intelligent conclusion.

It would appear from an examination of the authorities that the following pertinent statements apply to expert testimony: (1) Expert testimony is proper and competent concerning matters involving special knowledge, science, or skill upon subjects not within the realm of the ordinary experience of jurors, and which requires special research, experience and study to understand. (2) The law allows those experts so skilled to express opinion upon a hypothetical state of facts, and to testify whether or not a fact may or may not exist. (3) Such an expert opinion based upon assumed facts not supported by the evidence is of no value. (4) Such evidence, if impeached to such an extent that, in the opinion of the court, it has no probative value, is not sufficient to take the case to the jury. (5) The weight to be given to such expert testimony is ordinarily a question for the jury. (6) Jurors are not bound by the testimony of experts; their evidence is to be weighed as that of all other witnesses. (7) The evidence of experts is ordinarily sufficient to sustain a verdict, providing, of course, that it has not been impeached and the facts upon which it is based have been established.

In the case at bar, when the defendant made a motion to direct a verdict at the close of plaintiff's evidence, it was, in effect, a demurrer to the evidence, and the trial court sustained such motion and dismissed the action. This court, in reviewing such decision, will assume the existence of every material fact which the evidence on behalf of the plaintiff tends to establish, including the answers to the hypothetical questions by the doctors, and, in addition, give the plaintiff the benefit of the logical inferences therefrom. See *Zielinski v. Dolan,* 127 Neb. 153, 254 N. W. 695; *In re Estate of Skade,* 135 Neb. 712, 283 N. W. 851.

For the reasons given in this discussion of the questions involved, we have reached the conclusion that the plaintiff had made a case which entitled its submission to the jury, and that the trial court was in error in directing the jury to return a verdict for the defendant at the close of the plaintiff's evidence. The judgment is reversed and the cause remanded.

REVERSED.