[No. 29417. *En Banc.* April 26, 1945.]

HERBERT C. LYNCH *et al., Respondents,* v. NORTHERN LIFE
INSURANCE COMPANY, *Appellant.*[1]

'Reported in 158 P. (2d) 90.

*Preston, Thorgrimson, Turner, Horowitz & Stephan,* for appellant.

*C. W. Halverson, Cheney & Hutcheson,* and *John Gavin,* for respondents.

MALLERY, J.—This is an appeal by defendant from a judgment in favor of plaintiff entered upon the verdict of a jury.

Appellant, an insurance company, issued a policy of accident insurance on the life of Dr. Cornelius J. Lynch, of Yakima, Washington. The policy in question insured against "loss resulting directly and independent of all other causes from bodily injuries sustained during the term of this policy and effected solely through accidental means."

Appellant introduced no evidence in the case, electing to stand on its challenge to the legal sufficiency of the evidence interposed at the close of respondent's case.

The insured, a practicing physician of Yakima, died July 18, 1941, following an abdominal operation performed on him July 14, 1941. Dr. Paul J. Lewis, who was called by Dr. Herbert C. Lynch, son of insured, went to the home of insured around nine or nine-thirty the evening of July 14, 1941. The insured, who was dull mentally by reason of his illness, then gave a history of having been sick since Saturday, July 12th, and of having had pain in his abdomen and vomiting. Dr. Lewis testified that Dr. Lynch had a temperature and that his abdomen "was markedly distended and extremely tender and rigid, what we call a surgical abdomen." Dr. Lynch was immediately removed to a hospital and an operation performed on him that night by Dr. West, who was assisted by Dr. Lewis.

Dr. Lynch died at four-fifty a. m., July 18, 1941. The official death certificate signed by Dr. Lewis recites that the immediate cause of death was "Uremia Due to Anuria Due to Ruptured Diverticulum with Generalized Peritonitis."

Dr. Lewis saw the deceased while he was at the hospital and stated that he was semicomatose; that he had an uremic odor to his breath; that he did not make any urine practically from the time he entered the hospital; that his blood test showed a blood urea of 90, while a normal one is 15, and that this meant he had a retention of waste products in his blood stream; that he had irregular, labored breathing and a rapid, irregular heart action; that these are all symptoms of uremia. Dr. West stated that, while the deceased was at the hospital, he should have passed 6000 cubic centimeters of urine, but he only passed 450.

Charles D. Hessey, who had been for many years a warm personal friend of insured, testified that Saturday, eight-thirty p. m., July 12, 1941, Dr. Lynch called at the Hessey home on his way to the doctor's cabin seven miles up the river. Hessey accompanied Dr. Lynch to the cabin of the latter, where they arrived Sunday noon, July 13, 1941. The two remained at the cabin until about six p. m., when they returned to the Hessey home for dinner. While at the cabin Dr. Lynch removed his top shirt and undershirt in order to be more free while disconnecting some water pipes and performing other chores. Hessey noticed on the doctor's back a black and blue spot about three inches in diameter—"maybe in the small of his back, to the left of his spine." He did not inquire nor did the doctor volunteer any information, how he received the black and blue spot; in fact, neither mentioned it. This black spot was not known to the doctors at the time of the operation, at the time of Dr. Lynch's death, or at the making of the death certificate.

On the evening of Dr. Lynch's death, Dr. Ralph Shirey, pathologist at St. Elizabeth's Hospital, and Dr. Lewis performed a complete autopsy. The autopsy revealed the rupture of the diverticulum and the condition of generalized peritonitis. Upon examination of the kidneys, the doctors

found about the pedicle of the left kidney a massive hemorrhage, a mass of clotted blood estimated at twelve ounces and filling the two hands of Dr. Shirey. They immediately turned the body on its side and there found on the exterior of the body over the left kidney and outside the area of hemorrhage an area of ecchymosis or a bruise, black in center but fading to the sides, about three inches in diameter, the same injury observed by Mr. Hessey a few days before.

In explanation of why he had not discovered the kidney condition during the operation, Dr. West testified:

"A. As I have said before in describing the diverticula, if they are ruptured, they are ruptured from the inside; in other words, it is the increase of pressure inside the bowel that ruptures this diverticulum; and, should he have gotten this blow and there happened to be some gas in the descending colon, and there practically always is gas in that location, that gas—its natural way to escape would be downward, and it blew out the diverticulum. Q. In other words, the internal abdominal pressure caused by the external violence resulted in the rupture of the diverticulum? A. In my opinion, that's the way it happened. MR. BOUNDS: You say it might, Doctor? THE WITNESS: I say, in my opinion, that's the way it happened. Q. Doctor, when you operated on Dr. C. J. Lynch, why didn't you discover or why wouldn't you discover a hemorrhage around the kidney, the left kidney, of Dr. Lynch? A. Well, for a very simple reason. In the first place, you are some little distance from this kidney area, and, in the second place, this hemorrhage is back of the posterior lining, we call it the peritoneum, but the kidney is back of that lining; it is in the abdomen, that's true, but the kidney is not in the abdominal cavity as we understand it. That's all covered by a lining. In other words, the abdominal contents are in a sac, and this kidney is outside of that sac, so-to-speak. Q. Your operation was— A. (Interposing)—inside the sac. My operation was all inside the abdominal cavity, as we call it. In other words, my operation was all inside the sac, and the kidney and its hemorrhage is outside the sac."

Dr. West was of the opinion that the black and blue spot was caused by external trauma or external violence. "As to the form of this trauma or form of this external violence, I have no idea. It might have been a blow; it might

have been a fall." Dr. West further testified that in his opinion the same external violence which caused the black and blue spot caused the hemorrhage to Dr. Lynch's kidney, and that it caused "the ruptured diverticulum of Dr. Lynch."

The situation as described by Dr. Lewis, and which he found to exist at the autopsy, was outlined to Dr. West by hypothetical questions, and, from this and the knowledge he had gained when he operated on the deceased, he gave the jury his opinion that there had been an external trauma, caused by a blow or fall, which had resulted in the hemorrhage around the left kidney, and, by reason of the presence of gas in the colon, the rupture of the diverticulum had resulted.

An effort was made, on cross-examination of the physicians, to develop the view that the ruptured diverticulum was caused by constipated condition, and that, in the process of evacuation, the deceased might have overstrained. The physicians admitted that such a situation might cause a rupture, but Dr. Lewis had no knowledge of any constipated condition. Dr. Lewis found a constipated condition when he operated, which he broke up to avoid any future difficulty, but whether it was of such a character that had made evacuation difficult prior to the time the deceased became ill, does not appear even by inference. Dr. West said gas would accumulate when there is not a bowel movement, but, when he operated, there was not an unusual amount of gas in the upper colon.

The appellant assigns as errors the overruling by the court of its motions for a directed verdict, a nonsuit, and judgment notwithstanding the verdict, and the entry of judgment against appellant. We quote appellant's contention on these:

"Appellant bases its appeal on the propositions that the evidence as to the fact of an injury by accidental means, as well as the time of such injury, was entirely speculative and conjectural."

When Dr. Lewis saw the extensive external black and blue spot and the blood clot under it, he, as a physician, knew that it had been caused by the application of some

external force, and was competent to express that as his opinion. Neither he nor anyone else, other than an eyewitness, could tell whether the injury was accidental, but here the law comes to the rescue and indulges in a presumption and permits an inference to be drawn. We treated this subject in *Carpenter v. Pacific Mut. Life Ins. Co.*, 145 Wash. 679, 261 Pac. 792, as follows, p. 682:

"It is never presumed that one wilfully and purposely injures himself, or that another has wantonly or wilfully injured him. It would seem that, these marks of violent injury being shown to exist, a proper inference to draw would be that they were caused by 'external, violent and accidental means,' as provided in the policy."

■ It would seem quite clear from this and the statements of Dr. Lewis and Dr. West that there was ample evidence from which the jury could find that the deceased had sustained an accidental injury and that it caused the blood clot around the pedicle of the left kidney.

The next question the jury had to consider was whether the death of the deceased was the result of the injury. Dr. Lewis stated that the external trauma caused the hemorrhage around the pedicle of the left kidney and this in turn caused an anuria, which means a loss of the function of the kidney to produce urine, and that, when there is a trauma to one kidney, there is a reflex disturbance in the functions of the other kidney; that this is a matter of common knowledge; that, when the deceased's kidneys failed to function and produce urine, waste products which should have been eliminated through the kidneys were retained in the blood stream and produced a condition of uremic poisoning, and this was the immediate cause of death.

■ The appellant further contends that the injury to the kidney was not shown to be the cause of death because the possibility of the rupture of the diverticulum by some other possible cause was not negatived. It is true there is no testimony to the effect that the rupture could not possibly have been caused in any other way. Nor do we depart from the rule cited by appellant in *Frescoln v. Puget*

*Sound Traction, L. & P. Co.,* 90 Wash. 59, 155 Pac. 395, in which this court said:

"The cause of an accident may be said to be speculative when, from a consideration of all the facts, it is as likely that it happened from one cause as another."

That rule expresses no more than the general rule regarding the burden of the plaintiff to establish his case by a preponderance of the evidence. The bare possibility of the existence of a cause other than that relied upon does not preclude a preponderance of the evidence in its support. This is not a case where "it is as likely that it happened from one cause as another." As was said in *Letres v. Washington Co-Op. Chick Ass'n,* 8 Wn. (2d) 64, 71, 111 P. (2d) 594:

"A verdict does not rest upon surmise or conjecture when there is evidence that there is a greater probability that a thing happened in such a way as to fix liability upon the person charged with such liability than there is that it happened in a way for which the person so charged would not be liable."

 The evidence in this case, as outlined above, shows that the deceased had sustained an external injury. The jury was instructed that the law presumed that such injury was accidental. There was evidence from which the jury could, and did, find that the injury caused the kidneys of the deceased practically to cease functioning and also caused the rupture of a diverticulum, and the uremia and peritonitis developed, from which death followed. There is no evidence in the record of death from any other cause or that either uremia or peritonitis was the result of anything other than the external injury.

The evidence meets the test set forth in the above-quoted rules.

The judgment is affirmed.

BLAKE, JEFFERS, and GRADY, JJ., concur.

ROBINSON, J. (concurring)—I concur in the result. In my opinion, the respondents in this cause presented a much stronger case than the respondent did in *Flyzik v. Travelers Ins. Co.,* 20 Wn. (2d) 35, 114 Pac. 739, in which a recov-

ery was approved by this court by a majority of seven to two.

MILLARD, J. (dissenting)—The son and daughter of insured, as beneficiaries, brought this action to recover on a policy of accident insurance. The administrator of estate of the daughter, who died during the trial of the action, was substituted in her stead as a party plaintiff. The defendant appeals from the judgment entered by the court on the jury's verdict in favor of plaintiffs.

The policy issued by the appellant insured Dr. Cornelius J. Lynch against

". . . loss resulting directly and independently of all other causes from bodily injuries sustained during the term of this Policy and effected solely through accidental means . . ."

"If such injuries shall cause continuous total disability as defined in Part II, commencing within twenty days from the date of the accident, and during the period of such continuous disability but within four years from the date of accident shall result directly and independently of all other causes in any one of the losses enumerated in this Part, or within ninety days from the date of accident, irrespective of total disability, shall result in like manner in any one of such losses, the Company will pay the sum opposite such loss and in addition monthly indemnity as provided in Part II to the date of death, dismemberment, or loss of sight; but only one of the amounts so specified and the additional monthly indemnity will be paid for injuries resulting from one accident.

"Loss of Life (The Principal Sum) . . . . . . . . . . . . $5,000."

Respondents' evidence—there is no other evidence, as appellant elected to stand on its challenge to the sufficiency of the evidence at the close of respondents' case—is as follows:

The insured, a practicing physician of Yakima, died July 18, 1941, following an abdominal operation performed on him July 14, 1941. Dr. Paul J. Lewis, who was called by Dr. Herbert C. Lynch, son of insured, went to the home of insured "around nine or nine-thirty" the evening of July 14, 1941. The insured, who was dull mentally by reason of his

illness, then gave a history of having been sick since two days before "on July 12th . . . that was a Saturday . . . in which he had pain in his abdomen and vomiting." Dr. Lewis testified that Dr. Lynch had a temperature and that his abdomen "was markedly distended and extremely tender and rigid, what we call a surgical abdomen." Dr. Lynch was immediately removed to a hospital and an operation performed on him that night by Dr. West, who was assisted by Dr. Lewis, who testified:

"He found a generalized peritonitis that involved the whole abdomen, meaning by that that all of the small bowel was red and inflamed, fiery red and inflamed, and distended with gas. Not only was the small bowel this way, but also the large bowel was inflamed and redeemed and markedly distended with gas.

"Q. Now, Doctor, did you find the cause of this peritonitis? or just explain what you did find. A. A localized area was found in the lower left quadrant of the abdomen—that was sealed and walled off—from which the perforated contents of the bowel—of the ruptured diverticulum had come through; that was the cause of the peritonitis. Q. In other words, then, as I understand, the cause of the peritonitis was the coming-out of the fecal matter or matter from the bowel into the abdomen of the doctor; is that right? A. Yes, sir."

This witness testified that the diverticulum is in the lower part of the descending colon and that

"It is like a blister mark on the outside of an inner tube . . . It is a thinning of the wall. . . . that anything that would cause a sudden pressure, extra gas pressure, in a bowel, may rupture a verticulum;"

that probably one of the most frequent ways of rupturing a diverticulum is when you attempt to have a bowel movement and have to strain yourself; that a diverticulum is like a blister on the outside of an inner tube—it is an outpouching on the surface of the bowel—and Dr. Lynch had many of them—"you're born that way" and you never acquire them after your birth.

Dr. Lynch died four-fifty a. m., July 18, 1941. Dr. Lewis was present at the autopsy performed by Dr. Shirey. Dr.

West was not present. The official death certificate signed by Dr. Lewis recites that the immediate cause of death was "Uremia Due to Anuria Due to Ruptured Diverticulum with Generalized Peritonitis."

In explanation of this report, Dr. Lewis testified,

"Uremia is a failure of the kidneys to produce any urine, and the waste products that ordinarily should be secreted through the kidneys are retained in the blood stream and produce a condition of uremic poisoning;"

which was the immediate cause of the death of the insured; that the cause of the uremia was an anuria, which "is a loss of the function of the kidney to produce urine;" and that the cause of the anuria was the external trauma that produced the hemorrhage around the pedicle of the left kidney. In other words, the external trauma caused the anuria, which caused the uremia, which caused death of the insured.

Dr. E. S. West, the surgeon who operated on Dr. Lynch, testified that the direct cause of the death of insured

" . . . was uremia and its consequent anuria; in other words, uremic poisoning and a lack of kidney function; plus that is the general peritonitis with its consequent poisoning. . . . The cause of the peritonitis was the rupture of the diverticulum . . . I believe that the cause of the uremia was, first, general peritonitis; second, this unfortunate reaction to this [a blood] transfusion; and then, again, the other unfortunate fact that the kidneys were crippled from this blow or from this hemorrhage, rather . . . the original cause was the external violence."

Dr. West testified further:

"Q. Where did you make the incision? A. The incision was made in the right rectus, a little bit on the righthand side of the midline. . . . We found a general peritonitis. Everything was violently inflamed. The intestines, generally, were inflamed. The appendix, which was the area that we looked at first, that was violently inflamed, but it very evidently also was not the cause of the trouble. The abdomen everywhere had a purulent fluid. . . . In which, the pus-containing fluid, the pus was so evident that it was apparent in the fluid to the eye. . . . And the cause of that was a ruptured diverticulum, and this ruptured diverticulum was in the lower part of the colon, just above

922

the rectum. . . . that ruptured diverticulum . . . was . . . the cause of the peritonitis? . . . Q. About what was the size of that ruptured diverticulum? A. It wasn't large. . . . He had a good many of these diverticula in this particular area which is the lower part of the colon, and we couldn't even determine at the time of the operation which particular one was ruptured . . . probably the easiest way to explain it [how the ruptured diverticulum caused the peritonitis] is that a diverticulum is very much like an old inner tube. You have all seen inner tubes with more or less of the layers missing, and when a little air is put in, there will be little projections from the main tube . . . and that is what a diverticulum is; it is a weakening of the wall of the intestine, and out of this intestine come these little projections, and they, of course, are of the thinner part of the bowel; in other words, they are part of the bowel, with some of its coats weakened; and these projections may vary in size to, oh, one-eighth inch, and you see an occasional one that is an inch long or more. These were all small, maybe half an inch long and maybe a quarter or less in diameter, but there were a good many of them in this particular locality . . . [by the rupture of the diverticulum] it's nothing more or less than a blowout from pressure from within . . . when that rupture occurs, gas which is always present in the bowel would get into the free peritoneal cavity and possibly some liquid along with it, and both the gas and the liquid are heavily loaded with germs . . . They caused the peritonitis; and, when we say 'general peritonitis,' we mean that there's no protective area walling off this peritonitis—it's just spread throughout the entire abdomen. . . . we didn't find the particular one of the diverticula—we didn't try very hard because we had only one idea in mind and that was to seal off this area from doing any further damage, and, in doing that, we sealed off this entire area that had these many diverticula in it. . . . the lower colon was studded with diverticula. . . . constipation was present in the lower part of the colon, . . . we broke that up for fear it would give him trouble following—in his convalescent period. . . . He was constipated . . . it was broken up to remove any possibility of a strain being placed against it. . . . in a ruptured diverticulum, it's usually from pressure of a gas . . . Always from an inside source. . . . the doctor in attempting to have a bowel movement, straining himself, might have caused sufficient pressure to rupture a diverticulum . . . it could

have happened in this case . . . if he got a blow on the left kidney . . . if that caused the rupture, it would have happened right then . . . When [Dr. West] operated . . . the peritonitis was coming from this . . . this area that contained the diverticula."

Dr. West testified that he had never heard of a rupture of a diverticulum from an injury like that of Dr. Lynch in the back over the area of the kidney. There was no evidence, other than that we have recited, that a diverticulum would be ruptured by such an injury as respondents claim Dr. Lynch sustained.

Dr. Lynch died four-fifty a. m., July 18, 1941. At the autopsy performed upon the body the same day by Drs. Shirey and Lewis, it was discovered that Dr. Lynch had a massive hemorrhage (twelve ounces of blood) around the pedicle of his left kidney. There was found over the left kidney area an ecchymosis or black and blue spot on the skin of the doctor three inches in diameter. Dr. West was asked, assuming the foregoing to be true, to state whether the black and blue spot was "caused either from an internal or an external source." Dr. West was of the opinion that the black and blue spot was caused by external trauma or external violence. "As to the form of this trauma or form of this external violence, I have no idea. It might have been a blow; it might have been a fall." Dr. West further testified that in his opinion the same external violence which caused the black and blue spot caused the hemorrhage to Dr. Lynch's kidney, and that it caused "the ruptured diverticulum of Dr. Lynch."

In explaining his opinion, in view of the fact that the diverticulum is some distance from the kidney area, why the same external violence caused the rupture of the diverticulum and also caused the kidney hemorrhage, Dr. West testified:

"A. As I have said before in describing the diverticula, if they are ruptured, they are ruptured from the inside; in other words, it is the increase of pressure inside the bowel that ruptures this diverticulum; and, should he have gotten this blow and there happened to be some gas in the descending colon, and there practically always is gas in that loca-

tion, that gas—its natural way to escape would be downward, and it blew out the diverticulum. Q. In other words, the internal abdominal pressure caused by the external violence resulted in the rupture of the diverticulum? A. In my opinion, that's the way it happened. MR. BOUNDS: You say it might, Doctor? THE WITNESS: I say, in my opinion, that's the way it happened. Q. Doctor, when you operated on Dr. C. J. Lynch, why didn't you discover or why wouldn't you discover a hemorrhage around the kidney, the left kidney, of Dr. Lynch? A. Well, for a very simple reason. In the first place, you are some little distance from this kidney area, and, in the second place, this hemorrhage is back of the posterior lining, we call it the peritoneum, but the kidney is back of that lining; it is the abdomen, that's true, but the kidney is not in the abdominal cavity as we understand it. That's all covered by a lining. In other words, the abdominal contents are in a sac, and this kidney is outside of that sac, so-to-speak. Q. Your operation was— A. (Interposing) —inside the sac. My operation was all inside the abdominal cavity, as we call it. In other words, my operation was all inside the sac, and the kidney and its hemorrhage is outside the sac."

The insured gave no history of any accident of any kind or of receiving a blow. Dr. Lynch was sixty-seven years old when he died. His son, Dr. Herbert C. Lynch, testified that the afternoon of July 14th he telephoned the residence of his father, as the latter had not been at the office that day. He called on his father, who was in bed. He informed his son "he had eaten something and probably upset his stomach." He did not prescribe for his father, whom he visited about three hours later. The abdomen of insured was then rigid and he was drowsy and in a semistupor, whereupon the son called Dr. Lewis and an operation was performed that night by Dr. West. The son made an investigation, but could find no one who had witnessed any accident of which the father was a victim, nor could he find anyone who had heard the insured mention that he had been in any accident.

Charles D. Hessey, who had been for many years a warm personal friend of insured, testified that Saturday, eight-thirty p. m., July 12, 1941, Dr. Lynch called at the Hessey home on his way to the doctor's cabin seven miles up the

river from Hessey's home, which was thirty-three miles "up the Naches highway" from Yakima. Hessey visited with Lynch until midnight. At that time, Dr. Lynch, in answer to perfunctory query respecting how "he was feeling," said, according to the testimony of Hessey,

" . . . on the way up he had a little sick spell but he had gotten over it and, when he got up to the house, he said he felt all right."

Hessey accompanied Dr. Lynch seven miles up the river to the cabin of the latter, where they arrived Sunday noon, July 13, 1941. The two remained at the cabin until about six p. m., when they returned to the Hessey home for dinner. While at the cabin, Dr. Lynch removed his top shirt and undershirt in order to be more free while disconnecting some water pipes and performing other chores. Hessey noticed on the doctor's back a mark or blotch about three inches in diameter—"maybe in the small of his back, to the left of his spine." He did not inquire, nor did the doctor volunteer any information, how he received the black and blue spot; in fact, neither mentioned it. About seven-thirty p. m., following dinner with Mr. and Mrs. Hessey, Dr. Lynch

" . . . went out into a little house that we [Hesseys] have that has a stove and a bed in it . . . and he slept . . . about three hours . . . when he awakened, why he came in the house and we talked for, oh, I imagine for a half hour . . . following this talk . . . he was going to the hospital on his way home."

That was the last time, prior to his death, that Mr. Hessey saw Dr. Lynch.

Appellant's challenge to the sufficiency of the evidence to sustain a finding that death of insured was brought about by accidental means, should have been sustained.

A diverticulum, according to the medical experts, is a thinning of the wall of the colon like a blister mark on the outside of an inner tube. From birth the insured had many diverticula. A rupture of a diverticulum would permit poisonous matter to enter the abdomen, which would result in peritonitis. A straining or gas would cause a blowout of a diverticulum and produce peritonitis.

The medical experts testified that uremia was the direct cause of death plus general peritonitis and its consequent poisoning; that the peritonitis was caused by a rupture of a diverticulum in the lower part of the colon; that the general peritonitis was the first cause of the uremia; the second cause was the patient's unfavorable reaction to a blood transfusion; and, thirdly, that the kidneys were crippled from hemorrhage.

The testimony is utterly confusing. The medical experts testified that the black and blue spot on insured's back was caused by external trauma, which blow caused the hemorrhage around the left kidney and that that blow caused the ruptured diverticulum. The testimony of these experts is further that the cause of the uremia was an anuria, and that the cause of anuria was the external trauma that produced the hemorrhage around the left kidney. While uremia, or failure of the kidneys to produce urine, was given as the cause of death, the medical experts admitted there was nothing wrong with the kidneys, as the hemorrhage was outside of the kidneys and no hemorrhage was found inside the kidneys, nor did they know why the kidneys quit functioning unless the clot of blood outside the left kidney affected the kidneys by producing anuria—loss of functioning of kidneys—which brought about uremia and caused the death. The medical experts did not have personal knowledge of any case, nor had they ever read any record of a case, where a trauma to the back as in the case at bar, caused the rupture of a diverticulum.

The medical experts testified that they found constipation present in the insured, and that, in attempting to have a bowel movement, the insured might have strained himself and caused sufficient pressure to rupture the diverticulum. Without in any way ruling out such a possibility in the present case, or giving any reason on which such a possibility should be excluded, they stated arbitrarily, as their opinions, that the ruptured diverticulum was due to the external violence that caused the black and blue spot on Dr. Lynch's back.

It is clear from the evidence, which is recited above, that the cause of the rupture of a diverticulum of insured rests on mere conjecture to such an extent as to furnish no reliable basis for the jury's verdict that the rupture was caused by an accidental external blow. That is, the cause of the rupture is speculative, for the reason that, from a consideration of all the facts, it is as likely that the rupture resulted from straining of bowels which were constipated as that the rupture was caused by an external blow. See *Frescoln v. Puget Sound Traction, L. & P. Co.*, 90 Wash. 59, 155 Pac. 395.

*Doke v. United Pac. Ins. Co.*, 15 Wn. (2d) 536, 131 P. (2d) 436, and other like authorities cited to the effect that it will be presumed that, where death of insured is shown to have resulted from violent and external means, such death was accidental, are manifestly distinguishable on the facts from the case at bar, in which no such question is presented.

*McNaught v. New York Life Ins. Co.*, 143 Neb. 213, 9 N. W. (2d) 160, 12 N. W. (2d) 108, is not in point. There was ample evidence in that case to establish the fact of accidental injury to body of insured,—discoloration or bruised mark was evident for a number of weeks—and the evidence is also clear and sufficient that insured died as a result of that injury.

We are, in common with many other jurisdictions, committed to the rule that it will be presumed, where evidence showed injury to body which appeared to have been caused by external force, that it was result of accident and not self-inflicted. However, as in the case at bar, if the evidence goes no further than to show death might have resulted from that injury for which there is liability, or that it was just as likely death resulted from another cause for which there is no liability, the jury will not be permitted to speculate and return a verdict for the cause for which there is liability.

The following language from the opinion in *Coombs v. James*, 82 Wash. 403, 406, 144 Pac. 536, which on principle is in harmony with *Hill v. Great Northern Life Ins. Co.*, 186 Wash. 167, 57 P. (2d) 405, is apt:

"We have often said that mere evidence of different causes that could produce an injury is not sufficient, and that where circumstantial evidence is relied upon to establish a cause of injury, it is not sufficient to show causes for which the defendant would be liable which could have produced the injury, without showing that it could not have been produced in any other manner or in a manner for which the defendant would not be liable."

"In an action upon an accident insurance policy, the burden which the injured plaintiff assumes is to show that injury or death was due to accidental or other means specified in the policy. . . .

"It is undoubtedly true that, in determining the cause of a death for which recovery is sought, the jury may not speculate or conjecture as between several causes. That is to say, where the evidence goes no further than to show that death may have resulted from one of several causes, for one or more of which there is liability, and for another or others of which there is none, then the jury cannot speculate or conjecture and return a verdict as for a cause for which there is liability." *Hill v. Great Northern Life Ins. Co.*, 186 Wash. 167, 57 P. (2d) 405. See, also, *Crowell v. Sunset Cas. Co.*, 21 Wn. (2d) 238, 150 P. (2d) 728.

In *Hill v. Great Northern Life Ins. Co.*, *supra*, the evidence is clear that the insured, while operating an automobile, sustained an injury to his head in a collision of his automobile with another vehicle and cerebral hemorrhage resulted from that head injury and caused death of insured. That is, death was caused by cerebral hemorrhage directly resulting from the accident.

In *Dreher v. Order of United Commercial Travelers*, 173 Wis. 173, 180 N. W. 815, which, on principle, is consistent with *Hill v. Great Northern Life Ins. Co.*, *supra*, (the two cases are distinguishable on the facts) a directed verdict for the insurer was affirmed. In that action, which was on a policy insuring only against death by external, violent, and accidental means, and excepting death from asphyxiation, the evidence was that insured went into the garage to get his automobile ready for a trip with his wife. Receiving no response to her call to her husband to come to lunch, the wife went to the garage, where she found

her husband sitting on the fender of the automobile, on the right-hand side, with his head resting on the top of the fender. She touched his shoulder, he looked up and apparently tried to speak, but did not. With the aid of two men, he was carried outside the garage and laid on the grass. He was dead. Three witnesses testified that they saw a reddish spot on the temple of deceased a short time after his death. The medical expert testified that he was of the opinion that a blow caused the death of insured. The court said:

"The only evidence, therefore, from which it may be inferred that external injury caused the death is the evidence of the doctor that a blow which caused the mark on his temple might have caused death, and that because he was dead it was his opinion that he died as the result of such a blow. The opinion of the physician as to the cause of death is invoked to supply the substantive facts necessary to support his conclusion. This cannot be done. It is the function of opinion evidence to assist the jury in arriving at a correct conclusion upon a given state of facts. To endow opinion evidence with probative value it must be based on facts proven or assumed, sufficient to enable the expert to form an intelligent opinion. The opinion must be an intelligent and reasonable conclusion based on a given state of facts and be such as reason and experience have shown to be a probable resulting consequence of the facts proved. The basis of the conclusion cannot be deduced or inferred from the conclusion itself. In other words, the opinion of the expert does not constitute proof of the existence of the facts necessary to support the opinion. See *Bucher v. Wis. Cent. R. Co.*, 139 Wis. 597, 120 N. W. 518, where many cases are reviewed.

"Doctor Quinn may be credited with the expression of his honest opinion concerning the cause of the death of the deceased. His opinion in that respect, however, could be nothing more than mere intuition or conjecture. It has no probative force, because not based on facts which were necessary to give to it that degree of certainty required for the support of verdicts."

Under the evidence, the cause of the rupturing of the diverticulum of insured is wholly conjectural. It may have been caused by the insured in straining for a bowel

movement, or due to the age of the insured, who was more than sixty-five years old, some one of the many diverticula that he had could not withstand the strain doubtless caused by indigestion two days before the operation. There is, also, the surmise that a diverticulum may have ruptured as a result of a blow. At all events the cause of the rupture remains an uncertainty and a speculation, and rests on mere conjecture. It is as likely that the rupture of the diverticulum resulted from one of the causes mentioned as another.

The judgment should be reversed, and the cause remanded with direction to the trial court to dismiss the action.

BEALS, C. J., STEINERT, and SIMPSON, JJ., concur with MILLARD, J.

May 21, 1945. Petition for rehearing denied.

